:(Opinion published 57 N. W. Rep. 156.)

---

JOHN J. RHODES *vs.* RICHARD A. WALSH *et al.*

Argued Nov. 29, 1893.   Reversed Dec. 21, 1893.

Nos. 8321; 8322.

.A member of the Legislature is not exempt during a session from service of civil process.

Article 4 of section 8 of the constitution of the state of Minnesota provides as follows: "The members of each house shall in all cases except treason, felony and breach of the peace, be privileged from arrest during .the session of their respective houses and in going to and returning from

the same." *Held* that, under said constitutional provision, a member of the legislature is not privileged from the service upon him of a summons in a civil action during a session of said legislature.

Appeal by plaintiff, John J. Rhodes, from an order of the District Court of Ramsey County, *Charles E. Otis,* J., made April 12, 1893, vacating and setting aside the service of the summons in the action.

On March 20, 1893, plaintiff commenced this action against Richard A. Walsh, Ignatius Donnelly, P. B. Winston, James A. Boggs, Hiler H. Horton, William Lockwood, Frank L. Morse, and others, defendants, alleging that they conspired to, and did on March 13, 1893, break and enter his office in Endicott Building, St. Paul, and carry away his private books, papers and correspondence, to his damage $50,000, for which sum he demanded judgment.

The defendants above named each presented to the Court his petition under oath, stating that the summons in the action was served on him March 20, 1893, while he was a member of the Senate or House of Representatives of this State engaged in his duties as such officer and while the two Houses of the Legislature were in session. Each petitioner claimed that he was, as such member, privileged from service of any civil process upon him, during the session and asked that the service on him be set aside and adjudged null and void.

The Court made orders on each petition requiring the plaintiff to show cause on April 10, 1893, why the prayer of the petition should not be granted. After argument, the Court on April 12, 1893, granted the prayer of the petition and set aside and vacated the service of the summons in each instance, saying:

In *Anderson* v. *Rountree,* 1 Pinney 115, the supreme court of Wisconsin held that a member of the Legislature was, during and for a limited time before and after the session, privileged from the service of summons; that this was a common law right unaffected by the statute providing for exemptions from arrest. At the time this decision was rendered, Minnesota was part and parcel of the Territory of Wisconsin, and this declaration of privilege by a court of last resort became the law of the land, or at least, as it seems to me, became and remains binding upon, and is to be followed by, all other courts within the jurisdiction, until overruled by a like tribunal of last resort, in the same manner and to the same extent as

if rendered by the Supreme Court of the Territory or of the State of Minnesota. At the same time, after a very careful examination of the authorities, I think the correctness of that decision is open to serious question. It is doubtless supported by a few ill-considered decisions, and by numerous *dicta* in other cases which assume the existence of such privilege as a common law right. Its existence, however, was denied in England as early as A. D. 1640 by that eminent jurist, Sir Orlando Bridgman, in the case of *Benyon* v. *Evelyn* (Bridgman's Reports, 333), upon a full review of the authorities and an exhaustive discussion of the question, and the doctrine then announced, as well as the profound learning and research of the jurist declaring it, were highly commended and indorsed by Lord Ellenborough in *Burdett* v. *Abbott*, 14 East, 134. See, also, *Gentry* v. *Griffith*, 27 Tex. 461; *Case* v. *Rorabacher*, 15 Mich. 537; *Merritt* v. *Giddings*, 4 McArthur, 55. It is for this court, however, to follow the decisions of our courts of last resort, and leave it to them to overrule ill-considered and erroneous declarations of the law, if any such have been made.

*C. D. & Thos. D. O'Brien*, for appellant.

The authorities cited and relied upon by the appellant upon the hearing of the motion are found in the *memorandum* of the Court below accompanying its order vacating the summons. To these may be added the case in our own Court, of *Kerwin* v. *Sabin*, 50 Minn. 320, where the rule is incidentally determined in considering the privileges of a senator of the United States during his term of office.

The question should be discussed entirely upon the construction of the several provisions of the constitution of this state applicable to it. Const. Art. 1, §§ 8, 10; Art. 4, § 8; Potter's Dwarris Stat. 637.

*Warner, Richardson & Lawrence* and *H. W. Childs*, for respondents.

By the enabling act, 9 U. S. Stat. 407, § 12, passed in 1849, it was provided:

"That the inhabitants of said Territory shall be entitled to all the rights, privileges and immunities heretofore granted and secured to the Territory of Wisconsin and its inhabitants; and the

laws in force in the Territory of Wisconsin at the date of the admission of the State of Wisconsin shall continue to be valid and operative therein."

In 1840 in the case of *Doty* v. *Strong*, 1 Pinney 84, the provision of the constitution of the United States, Art. 1, § 6, similar to ours was examined by the Supreme Court of the Territory of Wisconsin, to which we then belonged. The word "arrest" was construed and the Court decided that it must be given a liberal rather than a literal meaning, and held that defendant Doty, a Territorial Delegate to Congress from Wisconsin, could not be sued. A similar decision was made in the case of *Anderson* v. *Rountree*, 1 Pinney 115, decided in 1841. There the defendant was a member of the Legislative Council of the Territory. The Court passed upon the meaning of the word "arrest" and held the privilege broad enough to exempt the defendant from any action, whether accompanied by actual seizure of his person or not. Thus it was, that when our constitution was adopted the word "arrest" had a fixed and definite meaning and included the service of civil process, as at common law all suits were commenced by arrest.

Where our state has borrowed from another a statute which has been passed upon by its courts it is held that the settled construction of that statute is adopted with it and must prevail. *Ozmun* v. *Reynolds*, 11 Minn. 459; *Nicollet Nat'l Bank* v. *City Bank*, 38 Minn. 85; *In re St. Paul & N. P. Ry. Co.*, 37 Minn. 164; *McNamara* v. *Minneapolis Cent. Ry. Co.*, 12 Minn. 388; *Drennan* v. *People*, 10 Mich. 169; *Daniels* v. *Clegg*, 28 Mich. 32; *Pangborn* v. *Westlake*, 36 Ia. 546; *Cronan* v. *Cotting*, 104 Mass. 245.

This interpretation was adopted in other jurisdictions, long prior to the Wisconsin decisions, and it has been repeatedly reaffirmed. *Bolton* v. *Martin*, 1 Dall. 296; *Geyer* v. *Irwin*, 4 Dall. 107; *Gibbes* v. *Mitchell*, 2 Bay 406; *King* v. *Coit*, 4 Day 133; *Nones* v. *Edsall*, 1 Wall. Jr. 189; *Holmes* v. *Morgan*, 1 Phill. 217; *Huderson* v. *Prizer*, 9 Phill. 65; *Miner* v. *Markham*, 28 Fed. R. 387.

On grounds of public policy, witnesses and others are treated as having the same right, and it is in such cases that the word "arrest" has been most frequently construed. *Bridges* v. *Sheldon*, 7 Fed. R. 17; *In re Healey*, 53 Vt. 694; *Person* v. *Grier*, 66 N. Y.

124; *Sanford* v. *Chase*, 3 Cow. 381; *Larned* v. *Griffin*, 12 Fed. R. 590; *Sherman* v. *Gunderson*, 37 Minn. 118; *First Nat'l Bank* v. *Ames*, 39 Minn. 179.

The decision in *Wilder* v. *Welch*, 1 MacAr. 566, is contrary to all precedent. *Atchison* v. *Morris*, 11 Fed. R. 582; *Jacobson* v. *Hosmer*, 76 Mich. 234.

It is true that the right for which we are contending was surrendered by statute in England in 1770, but it none the less existed there up to that time. *Cassidy* v. *Stewart*, 2 Man. & G. 437.

BUCK, J. The plaintiff commenced a civil action in the district court of Ramsey county, in this state, against the defendants, on the 20th day of March, 1893, alleging in his complaint that prior to that time the defendants, except defendants Wells and Scheffer, had unlawfully and maliciously conspired to break and enter the plaintiff's office, to take and carry away his private books, papers, and correspondence, and that in pursuance of such conspiracy they unlawfully directed and required said Wells and Scheffer to proceed to plaintiff's said office, and forcibly break and enter the same, and take and carry away therefrom plaintiff's said books, papers, and correspondence, and that on the 14th day of March, 1893, in obedience to said instructions and orders, said Wells and Scheffer did so unlawfully break and enter plaintiff's said office, and carried away said books, papers, and correspondence, and demanded judgment in the sum of $50,000.

At the time of these transactions, several of the defendants, including Horton and Boggs, were members of the legislature, then in session.

Subsequently to the service of the summons upon them, but before the expiration of the time for answering, Horton and Boggs filed a petition in the court below alleging that they were members of the legislature of the state of Minnesota at the time of the service of the summons upon them, and that as such members they were privileged from the service of civil process during the session of the legislature, and that they were members of the house of representatives. Upon this petition an order to show cause was issued by the court below, requiring the plaintiff to appear and show cause why the service of the summons upon Horton and

Boggs should not be set aside upon the ground that they were members of the house of representatives. Upon the hearing, April 7, 1893, the court set aside the service of the summons upon the two defendants, Horton and Boggs, upon the ground that, as such members of the legislature of the state of Minnesota, they were privileged from the service of any summons in a civil action during the term of such legislature.

The question involved here is whether such privilege existed, and whether the service of the summons was valid. In order that there shall not be any misunderstanding of this opinion, we state that in no way do we pass upon the merits of the plaintiff's complaint, or whether the defendants had the right to commit the acts which plaintiff, in his complaint, charges them with having done. That question is not before us.

The question, however, involved, is one of very grave importance, and deserves, as it has received, the most careful and serious consideration. Even though, upon the first examination of the question, we may have had no doubts as to the law upon the subject, yet, when a large and intelligent body of men, representing a coordinate branch of the state government, claim certain privileges under a clause in the fundamental law, it becomes our imperative duty to examine the question with all the care, good faith, and ability which it is possible for us to do.

It is well understood that the powers of the state government are divided into three distinct departments,—legislative, executive, and judicial; and no person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others, except in the instances expressly provided in the constitution. Const. Art. 3, § 1.

Each of the departments, within its proper sphere, is supreme. Probably, it would be difficult to find a more harmonious system of governmental workings than exists in these three co-ordinate departments, by which the functions of our state government are carried on. Each having due respect and proper regard for the rights of the other, no conflict need arise, as none has arisen, during the entire history of the state. Nor is this a case arising between these co-ordinate departments of the state government, but a question arising between one or more members of the legislature and the individual

citizen. It is therefore a judicial, and not a legislative question; that is, the question is not one of legislation or legislative powers upon general legislative subjects, but one affecting the privileges of the individual member, and the individual rights of the citizen. The main question is over the meaning or interpretation of a constitutional provision, which, in this case, is for the judiciary to determine, and which it must determine, because it has been brought before us. However disagreeable or difficult the questions submitted for our consideration and determination are, there is but one course for us to pursue, and that is to abide by the law and the constitution. It may not be inappropriate to cite the opinion of Chief Justice Marshall upon this subject in the case of *Cohens* v. *Virginia*, 6 Wheat. 404, where he said: "The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass by a question because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if brought before us. We have no more right to decline the exercise of deciding than we have to usurp a power not given. The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid, but we cannot avoid them. All we can do is to exercise our best judgment, and to conscientiously perform our duty."

Referring again to the main question, is there such inviolability surrounding a member of the legislature that service of a summons in a civil action cannot be made upon him while such legislature is in session? He has a right, during all such time, to bring a suit himself against the individual citizen, and individual rights should be equal and reciprocal; and they are so, unless there is an exemption or privilege paramount and superior in behalf of the legislator. All citizens should be deemed to stand equal in their rights before the law. This country recognizes no special privileged class, except those exempt by express provision of law or the constitution; and, when a citizen or officer claims such privilege, it is his duty to show affirmatively and conclusively that he is privileged above others of his fellow citizens.

We do not concede any such inherent right on the part of a member of the legislature as contended for by defendants' counsel. If it exists at all, it is because it is conferred by the constitutional pro-

vision in question. Before considering this provision more particularly, let us examine some of its other provisions, and see what are the rights of the people: "Government is instituted for the security, benefit and protection of the people." Const. Art. 1, § 1. "Every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive in his person, property or character; he ought to obtain justice freely and without purchase; completely and without denial; promptly and without delay, conformably to the laws." Id. § 8.

These words were not inserted in the constitution as a matter of idle ceremony, or as "a string of glittering generalities." It is the pride of the American citizen, and one of the grandest attributes of citizenship, that these provisions of the fundamental law stand as a protection and unassailable bulwark against the enforcement of unjust and illegal power. The constitution did not create property, or the liberty of the citizen, but it does protect both; and its prohibitions and inhibitions stay the march of organized or individual power, when it attempts the conversion of one or the destruction of the other. The exercise of official or individual power can only be enforced within the constitutional restrictions, and it should pause when the danger line is reached, and the life, liberty, or property of the citizen becomes thereby imperiled. The attempt sometimes made to exercise illegal power is the first warning which the people have of its assumed existence.

Turning now to the constitutional provision in question, we find it reads as follows: "The members of each house shall in all cases except treason, felony and breach of the peace be privileged from arrest during the session of their respective houses and in going to and returning from the same; for any speech or debate in either house they shall not be questioned in any other place." Id. Art. 4, § 8.

The defendants contend that the word "arrest," in the above constitutional provision, is broad enough to exempt them from the service of process, whether accompanied by actual seizure of the person or not, and that courts cannot strip them of this right. If this right or privilege exists, they would be correct in their contention. This, however, is not an attempt to strip them of power, but a question of the very existence of the power itself. If it does not

exist, then they are not stripped of any power whatever. An exemption or privilege cannot be created or lawfully exercised simply because it is claimed or asserted. The English parliament once asserted the legislative privilege of its members from arrest, and then, as an omnipotent judicial body, decided that such privilege existed, but that system of procedure is not a part of our governmental administration. And even there such proceedings became so odious and unpalatable, and such abuses were practiced under it, that the privilege was finally abolished by statute,—matters which we shall refer to hereafter in this opinion.

It is further contended by the defendants that the courts of the state of Wisconsin, prior to the date of our organic law, decided this question in accordance with their claims, and that when our constitution was adopted, October 13, 1857, the word "arrest" had a fixed and definite meaning in the minds of those who framed it, and that we should follow the decisions of the courts of that state; and in support of this view they cite the case of *Doty* v. *Strong*, 1 Pinney, 84, where a summons in a civil action was served on a delegate in congress from that state, and the court construed the clause in the constitution of the United States upon this question in accordance with the view of the defendants herein. The case of *Anderson* v. *Rountree*, Id. 115, (decided in 1841,) is also cited. It was the case of service of a summons upon a member of the legislative assembly of that state one day after the adjournment of the assembly, and the court held that he was privileged from the service of such summons. These are all of the decisions of the courts of the state of Wisconsin that we are referred to, and they were made prior to the passage of the organic act creating a territorial government for Minnesota.

To further support this view of their case the defendants quote from our organic act (passed in 1849) 9 U. S. Stat. 407, a part of section 12, as follows: "That the inhabitants of said Territory shall be entitled to all the rights, privileges and immunities heretofore granted and secured to the Territory of Wisconsin, and to its inhabitants; and the laws in force in the Territory of Wisconsin at the date of the admission of the state of Wisconsin, shall continue to be valid and operative therein." This quotation is correct, so far as it goes; but, to understand the full meaning and legal effect of

that section, we quote that portion omitted by defendants' counsel, and which follows the above extract, viz.: "So far as the same be not incompatible with the provisions of this act, subject however nevertheless, to be altered, modified or repealed by the governor and legislative assembly of the said Territory of Minnesota." Conceding, therefore, that the decisions of the courts of the State of Wisconsin are part of its laws, yet our organic act expressly reserves to Minnesota the right to alter, modify, or repeal such laws as were in force when the State of Wisconsin was admitted into the Union.

We are not willing to concede that this right would not exist without the above provision in the organic act. On the contrary, we think that the territorial legislature of Minnesota, or its constitutional convention, had a right to pass, frame, or adopt such provisions of law as they saw fit, not inconsistent with the provisions of the constitution of the United States. Nor are we bound by the decisions of the courts of the State of Wisconsin in the construction of their legislative laws similar in language to our constitutional provisions, however persuasive or able such decisions may be. And here it may be well to refer to the constitution of that State, adopted February 1, 1848, and in force when Minnesota was organized as a Territory, and when our constitution was adopted, in 1857; it being well understood that the Territory of Minnesota once formed a part of the Territory and State of Wisconsin. The provision of the constitution of that state in regard to the privilege of members of the legislature differs materially from ours. It is as follows: "Members of the legislature shall in all cases except treason, felony, and breach of the peace, be privileged from arrest, nor shall they be subject to any civil process during the session of the legislature, nor for fifteen days next before the commencement and after the termination of each session." Article 4, § 15. If it was the settled law of the Territory of Wisconsin that the word "arrest" had a fixed, definite, and settled meaning, and that it covered the service of a summons in a civil action, it seems strange that the latter phrase was inserted in the constitution of that state. Evidently, the members of that convention which framed the constitution had grave doubts about the soundness of the decisions of their court, or else they were guilty of tautology in framing their fundamental law; a transaction unheard of in any other instance, for constitu-

tions are framed in the most concise language possible. If the phrase, "nor shall they be subject to any civil process," be omitted, then the provision would be substantially like ours. Standing together, "arrest" means one thing, and "subject to civil process" means another, or else the latter phrase is utterly useless and unnecessary.

Now, assuming that the Minnesota legislature had the legal power to pass such laws as it deemed proper, not repugnant to the laws and constitution of the United States, we find that it passed a law defining the meaning of the word "arrest." 1851 R. S. ch. 113, § 1, is as follows: "Arrest is the taking of a person into custody, that he may be held for a public offense." Section 5 of the same chapter provides "that an arrest is made by an actual restraint of the person of the defendant, or by his submission to the custody of the officer." The same statute provides "that a civil action is commenced by the service of a summons delivered to the defendant personally, or by leaving a copy of the summons at his usual place of abode." All these provisions of the statute of 1851 were in force at the time of the adoption of our constitution, and ever since have been the law of this state. The same definition and meaning of the word "arrest" is given by the lexicographers, and in our law dictionaries. We cite the following authorities in support of our statutory definition of the word "arrest:" "An arrest is the taking, seizing, or detaining the person of another, touching or putting hands upon him in the execution of process, or any act indicating an intention to arrest." *United States* v. *Benner,* Baldw. 234. "An arrest signifies a restraint of the person; a restriction of the right of locomotion." *Hart* v. *Flynn,* 8 Dana, 191. "Arrest is the apprehension or detaining of the person in order to be forthcoming to answer an alleged or supposed crime." *County of Montgomery* v. *Robinson,* 85 Ill. 176. "By 'arrest' is to be understood, to take the party into custody. An arrest is the beginning of imprisonment, when a man is first taken and restrained of his liberty by power or color of warrant." *French* v. *Bancroft,* 1 Metc. (Mass.) 504.

The same meaning of the word "arrest" was well known and understood at the time of the adoption of our state constitution and it was not questioned in either of the two conventions; and it is a significant fact that the words, "nor shall they be subject to any civil process during the session of the legislature," found in the

Wisconsin constitution, were entirely omitted from our constitution. The meaning of the word "arrest," as defined above, has stood so long unchallenged that it will doubtless be a surprise to judges, lawyers, and the people of this state, that it is now for the first time, in any manner, questioned; and it will be a greater surprise if this court shall construe the law to be that, when an officer has served a summons upon a person in a civil action he has thereby arrested him. Nor does public policy or public interest demand any such interpretation of the word as contended for by the defendants. The provision in question, even as we construe it, is a most extraordinary one. We do not find it discussed during the constitutional debates at the time of the adoption of our constitution, being substantially the same as the provision in the constitution of the United States relating to members of congress, and seems to have been made a part of our constitution without debate or consideration by the conventions.

As members can only be arrested, during a session of the legislature, for treason, felony, and breach of the peace, does it not necessarily follow that they could not be arrested during such time for the most serious misdemeanors, unless such ones as may be included in the term "breach of the peace?" If so, then we are fully justified in saying that such provision is a most extraordinary one; and we do not feel justified in enlarging or extending the power by any strained or tortured definition of the word "arrest," or giving it a meaning in violation of the statute, of the decisions of the courts, and of lexicographers. The right already yielded up by the people in this respect seems sufficient, without having their rights in civil actions abated, and possibly lost or destroyed; and we have not the will or authority, by any strained construction, to aid in placing a constitutional provision beyond a reasonable and safe foundation, upon which the people may stand and defend their rights as against any branch of the sovereign power.

But it may be asked, what is the danger if the word "arrest" is construed as contended for by the defendants' counsel? Suppose a member should imprison his wife, child, friend, or a stranger, for some fancied or imaginary cause, and the writ of habeas corpus could not be served upon him, by reason of this legislative privilege,

what would become of our constitutional guaranty "that the writ of *habeas corpus* shall not be suspended."

What would this birthright of every American citizen be worth, if his personal liberty can be thus abridged and stand in abeyance, during a session of the legislature? This writ is not a criminal process. It can be served, and always is served, without arresting the defendant. Are the people ready to surrender up this great charter of the human rights in obedience to this demand of legislative privilege? Important as are legislative duties, the advantage of exempting a member from the service of this writ upon him would be a poor compensation for its denial, even for the period of three months.

Valuable property rights or interests might also be injured or destroyed if this theory of privilege is upheld. Take the subject of waste, which is legally defined to be whatever does lasting damage to the freehold, and, as ordinarily understood, implies taking of property without right, without sanction of law, in violation of right or liens thereon. The commission of waste might not only be a very serious injury to the individual citizen, but as between members of the legislature themselves. Suppose a senator residing in Dakota county owned a thousand acres of land, valuable principally for its timber, and he should sell the same to the senator from Otter Tail county, receiving back a purchase-money mortgage for nearly the full consideration of the land, and just at the commencement of a session of the legislature the senator from Otter Tail county should, with a large number of employes, commence cutting and removing such timber, with intent to forthwith cut and remove the same, and thus impair, if not substantially destroy, the mortgage security. Would not the senator from Dakota county have a right to apply to the court for redress, and, by a proper writ issued therefrom, enjoin the senator from Otter Tail county from committing such lasting damage? To say that this cannot be done is to say that we can trifle with vested rights in valuable property.

Again, suppose a member of the legislature, during a session thereof, should wrongfully and unlawfully enter upon a farm, and drive away a large amount of stock, and carry away other valuable farm

property, under an assumed claim of right, but not under such cir-cumstances as would constitute larceny or a breach of the peace. Would the rightful owner be without remedy or redress during a legislative session because of this assumed legislative privilege? What are property rights worth, if there is no protection for them?

Suppose the time limited for commencing suit upon valuable causes of action against a member would expire during a session of the legislature? Would the cause of action be lost because of this privilege? Certainly it would, if defendants' contention is correct.

Suppose, also, that one of the members of the legislature should interfere with our public conveyances, such as railroads and street cars, and thereby impede public travel and interfere with the pub-lic business. Can there be no remedy, no relief, and no redress? Such a claim is preposterous. And the same might be said in cases of the creation and continuance of private or public nuisances, whereby serious injury might result.

So, too, in case of a member of the legislature becoming insolvent, he could dispose of his property, or attempt to do so, by some fraudulent act, and before the creditor could have any summons served, or other civil proceedings instituted, he might be without remedy, and his rights lost, before an adjournment of the legis-lature. Attachment proceedings might also be thus rendered useless. One more illustration: It is a well-known fact that at the time of election, in several instances, members have been hold-ing important county or town offices, and continued to retain them, and receive the fees and emoluments thereof, in direct violation of a constitutional prohibition. Do the public interests require, or a sound public policy demand, that no writ of *quo warranto* shall be served upon a member of a legislature during a session thereof, in such cases? We say that the highest interests of the public, and espe-cially the public welfare of the communities affected, such as coun-ties and towns, demand that no such privilege or exemption shall exist.

However plausible the theory that a member of the legislature should not be embarrassed with private suits, and thus drawn aside from public duty, we think that the danger and disadvantage is more imaginary than real. We have never heard of an instance where men were deterred from serving as members of a legislature

because they were subject to service of process in a civil action, nor that public business was delayed or suffered from any such cause. It is a notable fact that the constitution provides that a majority of each house shall constitute a quorum for the transaction of business; and the people, through a constitutional amendment, have abolished annual legislative sessions. The rules of nearly all legislative bodies provide for granting leave of absence to individual members, and such leave is seldom refused. Nor, under ordinary circumstances, would a case be pressed for trial, against a member of the legislature, during a session thereof. If the claim of privilege is based upon the ground of public policy and public interest, it could as appropriately be claimed by the members of the executive and judicial departments, and by those who have ministerial duties to perform, most of whom are nearly all the time engaged in the discharge of their official duties. And may we not inquire, with great propriety, if it is not as important to execute the laws as to make them?

It remains for us to briefly refer to the authorities upon this subject. Among the English authorities, there appears to be some uncertainty and confusion upon the question of privilege from arrest. It was once the rule there, established to protect members of parliament from being molested by their fellow subjects or oppressed by the crown, and to prevent their being diverted from their public duties, and this privilege extended to exemption from the service of civil process. But as early as 1664, in the celebrated case of *Benyon* v. *Evelyn*, found in Bridg. 324, in the court of King's Bench, it was held: "It is lawful to sue out an original against a member of the House of Commons, although parliament is sitting." The opinion was delivered by the chief justice, Sir Orlando Bridgman, and he attacked Lord Coke for asserting a contrary doctrine in his treatise on the High Court of Parliament. In 4 Prynne's Brief Survey of Parliamentary Writs, (page 814,) it is stated that "the case of *Sir George Benyon* v. *Sir George Evelyn* was adjudged in the court of Common Pleas, (Hil. 15 & 16 Car. II.,) by all the judges thereof, upon demurrer, as follows: 'It was resolved upon solemn argument by all the judges (especially the lord chief justice, Sir Orlando Bridgman, arguing it very largely and learnedly) that the privilege of parliament did not take away the liberty of the subject to commence and prosecute actions of

trespass, debt, account, covenant, and the like, against members of Parliament, or their menial servants, even in Parliament time.'" Lord Campbell says of Sir Orlando Bridgman, the chief justice, "that this was his most celebrated judgment, and endeared his memory to the enemies of parliamentary privilege." The action itself was one in debt for merchandise, and the defense interposed was that Sir George Evelyn was a member of the house of commons, and privileged from service of process. These privileges and exemptions were pressed and claimed in so many instances that they became odious and intolerable, so that the courts of justice were called upon to determine the question; and finally Parliament itself passed an act in 1769, which we find in 10 Geo. III. ch. 50, which declares: "Sec. 1. Any person may at any time, commence and prosecute any action or suit in any court of record, or court of equity, or of admiralty, and in all cases matrimonial and testamentary, against any peer or lord of parliament of Great Britain or against the knights, citizens or burgesses for the time being or against any of their menial or any servants or any other persons entitled to the privilege of parliament; and no such action, suit, or other process or proceeding thereupon, shall at any time be impeached, stayed or delayed by or under any color, or pretense of any privilege of parliament." We believe that this act has been the law of England ever since, and settled all controversy upon the subject, and there established the doctrine contended for by the plaintiff here. This, it will be observed, was prior to our Declaration of Independence, July 4, 1776, and the adoption of the United States constitution, which was signed in 1787. We fail, therefore, to see how this claim of privilege made by the defendants could have been the common law of this country, or of the Territory or State of Wisconsin, or of this State, at any time.

The case of *Merrick* v. *Giddings*, reported in MacArthur & M. 55, is an able decision, rendered by Mr. Justice Wylie, holding that "a member of Congress of the United States is at all times as liable to service of process as any other individual, except that during his attendance on the session of congress, and in going to and returning, he is privileged from arrest in any suit or action."

In the case of *Gentry* v. *Griffith*, 27 Tex. 461, it was held that "members of the legislature are not privileged against the serv-

ice of citation in civil suits by virtue of the provisions in the constitution of the state granting immunity from arrest to such members during the session of the legislature, and while going to and returning from the same."

While some of the authorities cited by the defendants sustain their contention, yet most of them are not in point, and not applicable to this question. The privilege from service of a summons or process in a civil action, of a witness or party, in certain cases, as in attendance upon court, is based upon the ground that it is necessary for the due administration of justice. If witnesses or parties living beyond our jurisdiction, or abroad, were subject to the service of civil process when coming within the jurisdiction of the courts of this state, they would be deterred from coming at all, as nonresidents cannot be compelled to appear here and testify, and there might frequently be a failure of the complete administration of justice in such cases. Nor is there a case cited by the defendants' counsel which, by force of its reasoning, or weight as authority, tends in the least to change our views upon the question submitted for our consideration. We do not think that any practical injury can result to the public or the individual members of the legislature from our holding in this case as we do, but that, on the other hand, public interest and private rights might receive serious injury, and become greatly impaired or destroyed, if defendants' contention is upheld.

Possibly, this opinion has been extended to an unnecessary length, but the importance of the question is our excuse and justification for so doing. In conclusion, we say that this constitutional provision is not a mass of jangled words and unfathomable mysteries, and it should not be wrenched from its obvious meaning, in direct violation of its straightforward, grammatical sense.

The order of the court below is reversed.

(Opinion published 57 N. W. Rep. 212.)