WILLIAM B. WOOD, Appellant, v. BOONE COUNTY and J. W. KEIGLEY, Appellees.

**Poor persons:** SUPPORT OF TRANSIENT POOR: LIABILITY OF OFFICERS.
1 The liability of a county or its officials for relief of the poor is purely statutory; and as there is no statute creating a liability on the part of the county for failure to furnish proper relief to a transient poor person, a supervisor and overseer of the poor is not personally liable for such failure.

**Same:** GOVERNMENTAL DUTIES: LIABILITY. The furnishing of aid to
2 the poor is a governmental function, and generally neither the state nor its instrumentalities are liable for the performance of such duty.

*Appeal from Story District Court.*—HON. C. G. LEE, Judge.

MONDAY, NOVEMBER 20, 1911.

Action at law to recover damages due to defendants' failure to furnish plaintiff, who was a transient poor person, proper relief. Defendant Keigley was a member of the board of supervisors of defendant county and overseer of the poor of that county. At the close of plaintiff's testimony, the trial court directed a verdict for the defendants, and plaintiff appeals. *Affirmed.*

*Fitchpatrick & McCall* and *Robert M. Witmer,* for appellant.

*Harpel & Cederquist* and *E. H. Addison,* for appellees.

Deemer, J.—There being no legal obligation at common law upon a county or any of the instrumentalities of government to furnish relief to the poor, plaintiff's action, if he has any, must be bottomed upon some statute entitling him to relief. *Cooledge v. Mahaska County,* 24 Iowa, 211. His counsel think they find such duty in sections 2225 and 2230 of the Code, reading as follows:

1. Poor persons: support of transient poor: liability of officers.

A person coming from another state, and not having become a citizen of nor having a settlement in the state, applying for relief, may be sent to the state whence he came, at the expense of the county, under an order of the district court or judge; otherwise he is to be temporarily relieved in the county where he applies. Code, section 2225.

The township trustees of each township, subject to general rules that may be adopted by the board of supervisors, shall provide for the relief of such poor persons in their respective townships as should not, in their judgment, be sent to the county home. But where a city is embraced, in whole or in part, within the limits of any township, the board of supervisors may appoint an overseer of the poor, who shall have within said city, or part thereof, all the powers and duties conferred by this chapter on the township trustees. The relief may be either in the form

of food, rent or clothing, fuel and lights, medical attendance, or in money, and shall not exceed two dollars per week for each person for whom relief is thus furnished, exclusive of medical attendance. They may require any ablebodied person to labor faithfully on the streets or highways at the rate of five cents per hour in payment for and as a condition of granting relief; said labor shall be performed under the direction of the officers having charge of working streets and highways. When medical services are rendered by order of the trustees or overseers of the poor, no more shall be charged or paid therefor than is usually charged for like services in the neighborhood where such services are rendered. No supervisors, trustee or overseer shall be directly or indirectly interested in any supplies furnished the poor. Code, section 2230.

The poor must make application for relief to the trustees of the township where they may be, and if the trustees are satisfied that the applicant is in such a state of want as requires relief at the public expense, they may afford such relief, subject to the approval of the board of supervisors, as the necessities of the person require, and shall report the case forthwith to the board of supervisors, who may continue, or deny relief, as they find cause. The board of supervisors may examine into all claims, including claims for medical attendance, allowed by the township trustees for the support of the poor, and, if they find the amount allowed by said trustees to be unreasonable, exorbitant or for any goods or services other than for the necessaries of life, they may reject or diminish the claim as in their judgment would be right and just and this act shall apply to all counties in the state, whether there are county homes established in the same or not. This act shall apply to acts of overseers of poor in cities as well as to township trustees. Code, section 2234.

In addition to these sections, we quote the following as having some bearing upon the case:

Persons coming into the state, or going from one county to another, who are county charges or are likely to become such, may be prevented from acquiring a settlement by the authorities of the county, township or city in which such persons are found warning them to depart therefrom.

After such warning, such persons cannot acquire a settlement except by the requisite residence of one year without further warning.   Code, section 2226.

Such warning shall be in writing, and may be served upon the order of the trustees of the township, or of the board of supervisors, by any person; and such person shall make a return of his doings thereon to the board of supervisors, which, if not made by a sworn officer, must be verified by affidavit.   Code, section 2227.

The trustees in each township, in counties where there is no county home, have the oversight and care of all poor persons in their township, and shall see that they receive proper care until provided for by the board of supervisors. Code, section 2233.

All claims and bills for the care and support of the poor shall be certified to be correct by the proper trustees and presented to the board of supervisors, and, if they are satisfied that they are reasonable and proper, they shall be paid out of the county treasury.   In no case shall a trustee, or either of the trustees, nor overseer of the poor, draw an order upon himself, or ·upon either of the board for supplies for the poor, except such trustees or overseer has a contract to furnish said supplies.   Code, section 2235.

The board of supervisors may make contracts with the lowest responsible bidder for furnishing any or all supplies, medical attendance or services required for the poor, for a term not exceeding one year, or it may enter into a contract with the lowest responsible bidder, through proposals opened and examined at a regular session of the board, for the support of any or all the poor of the county for one year at a time, and may make any requisite orders to that effect, and shall require all such contractors to give bonds in such sums as it believes sufficient to secure the faithful performance of the same.   Code, section 2238.

The word 'poor' and 'poor person' as used in this chapter shall be construed to mean those who have no property, exempt or otherwise, and are unable, because of physical or mental disabilities, to earn a living by labor; but this section shall not be construed to forbid aid to needy persons who have some means, when the board shall be of opinion that the same will be conducive to their welfare and the best interests of the public.   Code, section 2252.

Now the charge in the petition is, in substance, that plaintiff was a foreign pauper; that he came into defendant county about January 25, 1908, with badly frozen feet which needed medical attention; that defendant Keigley was a member of the board of supervisors of defendant county, and a committee on and the overseer of the poor; that plaintiff made application to the defendant through its proper officers for relief, and that defendant undertook to furnish him some relief, but that, after undertaking the same, it negligently, wrongfully, and unlawfully withheld adequate or proper treatment, and on the 27th day of January "expelled plaintiff from Boone county," subjecting him to exposure, and depriving him of proper care until he reached Cerro Gordo county on the 29th day of January, where he was received and taken care of by the proper county authorities. He claims that by reason of the negligent and wrongful conduct of the defendant county, and its agent, Keigley, he lost both ·feet, and suffered great mental and bodily pain. The testimony shows that plaintiff arrived in the city of Boone at the time alleged; that his feet were frozen; that he went to the police station in Boone, and asked the chief of police where he could find a doctor. To this the chief responded that he would see. The mayor of the city was also present, and, after some cross-examination of plaintiff by these officials, plaintiff said to them that he was short of money, and needed a doctor. The police officer told plaintiff he would give him a night's lodging, and accordingly housed him in the police station during the night. When plaintiff arose in the morning, he made inquiry as to the doctor, and the chief of police said he would see about it. About 11 a. m. plaintiff was taken to the office of the county physician, and there examined and given some treatment. The doctor then said to him that he would have to get him into a hospital. After plaintiff's return to the police station after seeing the

doctor, he first met defendant Keigley, and he testified to
the following converastion with him, Keigley:

He told me that the doctor said for me to keep my
feet warm.  He placed a chair for me to put my feet
on near the radiator, and I made the remark to Keigley
that the doctor said he would get me in the hospital.  Mr.
Keigley said, "Did he say that?" and turned. and went
out of the station.  The doctor saw plaintiff on Sunday
morning, and on Monday morning he again visited plain-
tiff, at his, plaintiff's request, in company with defendant
Keigley and the chief of police.  The doctor dressed plain-
tiff's feet in the presence of the others, and remarked that
they were looking good.  At this time the doctor asked
plaintiff where he lived, and was informed that he used to
live in Wisconsin.  He was then asked if he wanted to go
there, and, in response, said that, if he had the means to
go, he would like to.  The doctor then said he would
talk with defendant Keigley about it.  On Monday after-
noon the chief of police came to plaintiff, and said, "We
are going to send you away on the 5:30 train."  Making no
protest, he started to walk to the depot, but was finally taken
in a buggy by the chief to the railway depot, and given
a ticket to Nevada, Story county, just as the train was
about to start.  When he arrived at Nevada, the following
occurred:  "The train reached Nevada about 6 o'clock,
where I got off.  A busman took me up to a restaurant.
I got some supper there.  After supper I walked on the
street thinking to see the marshal, and, not seeing him, I
went to a livery barn.  My feet were very painful at this
time, and I was more unwell than I was in the afternoon.
At the livery barn the proprietor permitted me to sleep in
the office.  The next morning I saw Mr. Corbin, the mar-
shal.  .  .  .  The livery man found him for me.  Mr.
Corbin said for me to stop there, and he would go and
build a fire at the city hall, and that I could then go there
and lie down.  About half an hour after that I walked
over to the city hall.  At the city hall that morning, Tues-
day, about 9 o'clock, Dr. Chamberlain came to see me.  My
feet were very painful, and I was getting quite sick.  The
doctor dressed my feet.  They were quite dark at that time.
After that visit I did not walk any more.  My feet had

got so painful that I could not. I was there until the evening train went east. Mr. Corbin bought me a ticket to Mason City, and gave me money to go from there to Wisconsin, and there was a cot and comforter brought in to me. The train left soon after 6 o'clock . . . the same number I came on from Boone.

He pursued his journey through Marshalltown, and was taken off the train at Mason City, and there given attention by the public authorities.

That plaintiff lost his feet by reason of inadequate and untimely treatment a jury may well have found, but the vital and fundamental question in the case is the liability of the defendant county and the member of the board of supervisors, who is made a codefendant. In addition to what has already been set out, the following is the only testimony of plaintiff with reference to defendant Keigley's connection with the matter:

I told Dr. Nimms I used to live in Wisconsin, that I had a brother there that I used to make my home with, but he was not living there. Q. Mr. Keigley was there? A. Mr. Keigley and Mr. Jones. Whether they were in there at the time we had this conversation I don't know. Q. Didn't you tell Dr. Nimms that you wanted to go to your relation in Wisconsin? A. He asked me if I wanted to go, and I said: 'If I had the means to go, I would go.' I didn't tell him I wanted to go. My first talk with Mr. Keigley was shortly after seeing the doctor the first time. I was sitting on a chair near the window by the radiator, and he said, 'The doctor says you must keep your feet warm,' and he got a chair and placed it there for my feet. Q. He spoke to you kindly? A. Yes, that was when I made the remark to him that the doctor told me he would get me into a hospital, and he remarked, 'Did he say that?' and went out. Q. What did you say? A. I said, 'Yes, sir,' and he went out. Mr. Keigley was in when the doctor was looking at my feet the next day. I don't call to mind that he made any remark in particular. That is the last time I saw Mr. Keigley.

However, the chief of police said that he purchased the ticket for plaintiff upon the advice of Keigley, and that he was reimbursed for the cost thereof by Keigley, and Keigley presented his bill to the board, and it was allowed. It should also be stated in this connection that there was testimony tending to show that with proper treatment at Boone plaintiff's feet might have been saved. Such is the record in its most favorable aspect for plaintiff, and we have to inquire whether or not there is any legal liability on the part of the defendants or either of them. It is argued that defendant Keigley may be liable, although the defendant county may not be, for the reason that he was under a personal duty of using due care—a care commensurate with the situation in which he found the plaintiff. Whatever the view of other courts upon this proposition, we are committed to the doctrine that, under the facts here disclosed, there is no liability on the part of Keigley, unless the county be held responsible. From *Packard v. Voltz,* 94 Iowa, 277, we quote as follows, directly applicable to the facts disclosed by this record: "It must certainly be an anomalous doctrine that would exempt the corporation itself from liability for the doing of a lawful act in a negligent manner, upon the ground of its compulsory agency in behalf of the public welfare, and at the same time affix liability upon its agent for precisely the same acts done under express authority. We think an instance of such liability is not to be found. It must be a reason for the rule of exemption on the part of a political corporation that its agency is a public necessity, and it seems to us that the same law that would give it exemption from liability would protect from liability the servant through whom only the corporation can discharge its duty to the public." See, also, *Beeks v. Dickinson County,* 131 Iowa, 245.

So that we are brought at last to the controlling proposition: Is a county liable in damages for failure to fur-

nish adequate and timely medical aid and assistance to a foreign pauper who may transiently be within its borders? A county is an instrumentality of government, and the furnishing of aid to the poor is a governmental function. The necessity for and the extent of such relief is largely, if not wholly, a matter of discretion, and is *quasi* judicial in character. The relief which may be granted a foreign pauper is temporary in character, and such persons may be prevented from acquiring a settlement in the county where found. Before one is entitled to relief under section 2234 of the Code he must satisfy the overseer of the poor within a city that he is in such a state of want as requires relief at public expense, and even then this section does not require that such relief be furnished. Moreover, not only the overseer of the poor must be so satisfied, but the board of supervisors are also to look into the matter, and inquire as to the necessities of the case.

It is a general rule that where a governmental duty rests upon a state or any of its instrumentalities, there is absolute immunity in respect to all acts or agencies. *Beeks v. Dickinson County, supra.* In this case it is said:

> In so far as a municipality undertakes the duty of making and enforcing quarantine regulations and other laws for the promotion of the public health, it is performing governmental functions, and its officers are not agents for whose actions or inaction it is liable, unless such liability is imposed by its charter or by the laws of the state under which it exists. . . . The remaining question is whether the members of the local board of health are individually liable for the loss of the plaintiff's crops. The statute makes it the duty of the health officers to quarantine against all 'infectious or contagious diseases dangerous to the public,' and it can not well be questioned that the defendants were acting within their scope of duty as such officers, and that in establishing the quarantine they were acting in a *quasi* judicial character. They were vested with the power to determine whether an infectious or contagious disease ex-

2. SAME: governmental duties: liability.

isted in the appellant's family, and, if found to exist, their duty under the statute required them to take proper steps to prevent its spread, and, had they neglected to do so, they would have been culpable in a high degree. They were therefore acting judicially, and it is the general rule that officers so acting are not liable for injuries which may result from such acts performed in the honest exercise of their judgment, however erroneous or mistaken the action may be, provided there be no malice or wrong motive present.

See, also, *McFadden v. Town of Jewell,* 119 Iowa, 324. As supporting the same proposition, see *Ogg v. Lansing,* 35 Iowa, 495; *Kincaid v. Hardin Co.,* 53 Iowa, 431; *Calwell v. Boone,* 51 Iowa, 687; *Saunders v. Ft. Madison,* 111 Iowa, 103; *Lahner v. Williams,* 112 Iowa, 428; *Easterly v. Irwin,* 99 Iowa, 696. A great number of cases announcing the same rule are to be found in 28 Cyc. pages 1305, 1306. Some cases seem to make an exception where the county undertakes to furnish relief, and in doing so negligently fails to use proper and necessary care. Such an exception seems to be made in *Meier v. Paulus,* 70 Wis. 165 (35 N. W. 301). But the contrary rule was announced in *Lexington v. Batson,* 118 Ky. 489 (81 S. W. 264); *Twyman v. Frankfort,* 117 Ky. 518 (78 S. W. 446, 64 L. R. A. 572); *Richmond v. Long,* 17 Grat. (Va.) 375 (94 Am. Dec. 461).

That the Wisconsin court did not intend to depart from the general rule is manifest from a consideration of a later case reported in 92 Wis. 263 (65 N. W. 1030), under the title of *Kuehn v. City of Milwaukee.* Again, in the *Meier* case, the action was against a county poor master for his personal neglect, and it is clearly stated in the opinion that defendant was under no obligation to receive an insane patient, and could not have been held liable for failure to accept him as an inmate of a county house, but that, having received him, he was under the duty of exercising ordinary care for his safety. The question of liability for failure to exercise a governmental

function was neither discussed nor decided. Conceding *arguendo* that the defendant Keigley might be personally liable for failure to exercise due care after undertaking to grant a relief, although the county itself would not be liable, this liability must be founded upon negligence, and it must be shown that he undertook to furnish plaintiff with proper treatment in virtue of his office, and that he either wrongfully or negligently failed to perform the duty. There is no showing that defendant did anything more than see the plaintiff when the county physician was treating him, and that he had no other part in securing his removal from the county than ratifying what the chief of police did by reimbursing him the amount paid for the ticket. It is very doubtful if this amounted to anything more than an attempt upon the part of defendant to get plaintiff out of the county, to which the plaintiff consented. But the greatest obstacle to recovery is the fact that there is no testimony tending to show that defendant Keigley knew it was dangerous to life or health to send the plaintiff away. The doctor who had charge of plaintiff for defendant county said in the presence of both plaintiff and Keigley that his, plaintiff's, feet were looking good. After that plaintiff started to walk to the train and was picked up by the chief of police and carried there in a buggy. There is a lack of testimony showing, or tending to show, that defendant Keigley had any knowledge or information of any danger involved in moving the defendant away from the county. The most that can be said is that defendant wanted to rid the county of the expense of caring for plaintiff, and that he was seeking to avoid furnishing aid. Had it been shown, as in the Wisconsin case, that defendant Keigley knew of the plaintiff's condition, and that he was likely to suffer great injury if he were not cared for, there might, if we were to adopt the reasoning of the minority of the courts, be some ground of liability. But the record does not disclose such a situation. However,

we are committed to the doctrine of absolute immunity in the performance of this governmental function to both the county and its officials, and, if we are to adhere to this rule so many times announced, the other proposition need not be considered.

We can not close, however, without suggesting that the practice of shifting foreign paupers from one county to another does not meet with our approval, and such a policy as said in *Mansfield v. Sac County,* 60 Iowa, 14, is a disgrace to our civilization.

Our conclusion is that the judgment must be, and it is, *affirmed.*