NORMAN F. CHAFFEE *vs.* TOWN OF OXFORD.

PETER J. TREMBLAY *vs.* SAME.

Worcester. February 5, 1941. — April 2, 1941.

Present: FIELD, C.J., LUMMUS, QUA, COX, & RONAN, JJ.

*Municipal Corporations*, Liability for tort, Officers and agents, Public welfare. *Public Officer.*

A finding, that a town was so in control of a wood lot not owned by it that it was liable for damage caused by a fire set there by welfare recipients cutting wood, would not have been warranted by evidence that without a vote of the town its board of public welfare had purchased from the landowner the privilege of cutting wood and was carrying on the cutting in order to provide jobs for able bodied recipients of welfare aid and to provide fuel for the town infirmary farm and for recipients of welfare generally.

The mere facts that wood cut for welfare recipients in a town was used in part for fuel at the town's infirmary farm, surplus produce of which was sold by the board of public welfare in insignificant amounts, and that the town was reimbursed for such of the wood as was furnished to needy persons having no settlements in the town, would not have warranted a finding that the wood cutting was a commercial project, carried on by the board as agents for the town, rather than a purely governmental and public project carried on by the board as public officers; and the town was not liable for damage caused by negligence of the wood cutters.

TWO ACTIONS OF TORT. Writs in the Superior Court dated July 1, 1938.

The actions were tried together before *Dillon*, J.

*C. W. Proctor*, for the plaintiffs.

*E. G. Norman*, (*R. P. Montague* with him,) for the defendant.

COX, J. These two actions of tort, tried together, were brought to recover damages caused by a fire, alleged to have originated on land belonging to one Roberts, from whom the defendant's board of public welfare on February 16, 1938, had purchased the right to cut and remove the standing timber and wood "in such manner as it sees fit, and . . . [to] retain this privilege and permission until the first day

of April, 1939." The trial judge directed verdicts for the defendant, subject to the plaintiffs' exceptions. These, with their exceptions to the admission of certain evidence, present the only questions. The defendant does not contend that the jury could not have found that the fire, which spread to the plaintiffs' premises and admittedly damaged their wood, was caused by smoking by welfare recipients on the Roberts lot while cutting wood under the supervision of the agent of said board. It could have been found that the fire was caused negligently.

It appears from the auditor's report that the defendant owns a large farm, which is maintained by it through said board. The house on the farm is called the "Infirmary" and is the almshouse (see G. L. [Ter. Ed.] c. 47, § 1; *Orlando* v. *Brockton*, 295 Mass. 205, 206) maintained by the defendant for its infirm poor, who live there. The average number of its inmates in 1937 and 1938 was thirteen. The wood on the Roberts lot was being cut by men who lived at their homes in the town and were receiving welfare aid, in return for which they were required by said board to work three days each week at or about the wood lot. Although the farm contained about two hundred seventy-five acres, only eighteen of these were tillage. Hens, cattle, pigs and a pair of horses were kept, and the produce of the farm was used for the maintenance of the inmates of the infirmary and of the warden and his family. From time to time some small surplus of products raised at the farm was sold, the receipts from which during a period of fifteen months in 1937 and 1938 were in evidence, and the auditor expressly found that the maintenance of the activities resulting in the "produce" was of such "an insignificant size" compared with the operation of the farm that they were only incidental, and that, neither by their nature, nor by the intention of the defendant, were they designed for the production of income. "They were not undertaken as a commercial enterprise. The Town Farm did not lose its character as a farm maintained for the poor, because it had surplus products which, eliminating their costs, were about eight per cent of the total expenditures of the farm."

There was evidence, apart from the auditor's report, that the arrangement for the purchase of the standing wood was made solely by said board; that there was no participation in it by the selectmen, and that there never was any vote of the town authorizing or directing the board to use the welfare recipients in cutting the wood, nor any vote of the town authorizing or directing its purchase, or the purchase of the lot itself. From the auditor's report, it appears that the wood, when sawed, was intended to be used as fuel by welfare recipients living in the town, and also to heat the farm buildings. None of it was intended to be sold. A few cords, however, had been furnished as welfare aid to indigent poor persons residing in the town, but whose settlements were in other municipalities, or who had no settlements. The defendant was reimbursed by these municipalities and by the State agency that assumed responsibility for the aid furnished to those who had no settlements. When the defendant prepared its bills for the aid so furnished, a charge at the rate of $8 per cord for the fuel supplied was made and paid. The only evidence as to the value of the wood was that, when cut and piled on the lot, it was worth from $4 to $5 a cord. It was sawed to stove length before delivery. The auditor expressly found that there were very few "sales, that they were not intended as such, and were at most only an insignificant item in the general course of welfare relief carried on by the town"; and that the wood cutting project was not a separate and distinct activity of said board, but was directly connected with the operation of the farm and a part of the unit of its management.

There was other evidence that some two hundred forty-six cords of wood were delivered to welfare recipients in 1938, the year of the fire. The expenses of the infirmary for the entire year were substantially $8,250, and the town spent for relief $36,472.54, which did not include the infirmary expenses, nor the value of the wood that was delivered.

Subject to the plaintiffs' exceptions, the records of the town were introduced in evidence, from which it appeared that at a "regular" town meeting in December, 1937, there

was an article in the warrant to see if the town would vote to purchase, through said board, the Roberts lot. The motion to authorize its purchase, provided the town voted to appropriate the money, was declared lost, and it was then voted to "dismiss" the article.

The plaintiffs contend, apart from the question of evidence, that the defendant is liable upon the theory either (1) that it controlled the wood lot, or (2) that the board of public welfare were acting as agents of the town and not as public officers.

1. We are of opinion that it could not have been found that the defendant was in control of the wood lot. G. L. (Ter. Ed.) c. 117, § 2, places the care and oversight of all poor and indigent persons who have settlements in the town in the board of public welfare "and [it] shall see that they are suitably relieved, supported and employed in the infirmary, or in such other manner as the town directs, or otherwise at the discretion of the board." The care of the board also extends to the needy who have settlements elsewhere or none at all in the Commonwealth. G. L. (Ter. Ed.) c. 117, §§ 14, 17. It does not appear that the town had given any directions, as it could, as to any manner of relief, support or employment, and accordingly the board had discretion in these respects. *Orlando* v. *Brockton*, 295 Mass. 205, 207. See *McKenna* v. *Kimball*, 145 Mass. 555, 556. It made the agreement with Roberts, in the name of the board and, as a board, agreed to pay him. The wood was bought "in order to provide a job" for able bodied recipients of welfare aid, and to be used as fuel by recipients of welfare generally. The work of cutting the wood was wholly a matter in the control of the board acting as public officers in the performance of strictly public duties. This the plaintiffs concede. The fact that this work was a part of the operation of the farm, which was maintained for the poor, does not change this.

The contention of the plaintiffs that the defendant is liable upon the theory of control by it of the wood lot cannot be sustained. *Curran* v. *Boston*, 151 Mass. 505, 509. *Kerr* v. *Brookline*, 208 Mass. 190. *Lead Lined Iron*

*Pipe Co.* v. *Wakefield*, 223 Mass. 485, 488. *Hennessy* v. *Boston*, 265 Mass. 559, 562. *Cacavas* v. *Lynn*, 267 Mass. 140. *Gosselin* v. *Northbridge*, 296 Mass. 351. The case ·at bar is distinguishable from *Miles* v. *Worcester*, 154 Mass. 511, *Jones* v. *Great Barrington*, 273 Mass. 483, and *Towner* v. *Melrose*, 305 Mass. 165, 167–168. See *Whalen* v. *Worcester Electric Light Co.* 307 Mass. 169, 176.

2. The members of the board of public welfare were acting as public officers and not as agents of the town in the operation of the farm, and the wood cutting project was a part of the operation of the town farm, which was connected with the infirmary and operated by the board for the care of indigent persons for whose support the town was responsible. We assume that the members of the board were duly elected and that they were the directors of the infirmary (see G. L. [Ter. Ed.] c. 47, §§ 1, 2). As already pointed out, relief, support and employment were not confined to the needy who were inmates of the infirmary. Others in the town, if any, as well as those having settlements elsewhere, or having no settlements within the Commonwealth, came under the care of the board. (See G. L. [Ter. Ed.] c. 117, §§ 1, 14, 17.)

The general rule is that municipalities are not liable for the negligent acts of public officers or employees in the performance of strictly public functions. *Bolster* v. *Lawrence*, 225 Mass. 387, and cases cited. *Orlando* v. *Brockton*, 295 Mass. 205, 207–208. *Everett* v. *Canton*, 303 Mass. 166. *Baumgardner* v. *Boston*, 304 Mass. 100, 106–107. The town had a right to the services of the welfare recipients to aid in their support. *Marlborough.* v. *Lowell*, 298 Mass. 271, 273. See *Commonwealth* v. *Pouliot*, 292 Mass. 229, 232; G. L. (Ter. Ed.) c. 117, § 21.

But it is contended that the board of public welfare was engaged in a commercial enterprise in that it furnished wood to the welfare recipients who had settlements elsewhere or none here, charged the wood "at a profit," used it in the maintenance and operation of the farm, and sold some of the farm products "at a profit." See *Little* v. *Holyoke*, 177 Mass. 114, 117. In other words, the plaintiffs contend that

the defendant is liable because some of the results of the work done amounted to a departure from the obligation imposed by law to support the needy and virtually put the town in business, and that the case does not come within the general rule but comes within the exception that a municipality may be liable for negligent acts of its officers or employees in the performance of functions commercial in character, undertaken for its own profit or to protect or benefit its corporate interests.

We are of opinion that the case at bar is not within the exception. The question whether a given case comes within the exception depends upon a reasonable interpretation and application of the facts. The plaintiffs concede that the supplying of fuel to the needy of the town and the employing of recipients of aid come within the proper function of the board, see *Neff* v. *Wellesley*, 148 Mass. 487, 493, 494; *Curran* v. *Boston*, 151 Mass. 505, 507, 508; *Orlando* v. *Brockton*, 295 Mass. 205, and that there is no good reason why it could not buy the standing wood and have the recipients cut it. When all the statutory obligations to provide aid are taken into consideration, as well as the right to maintain an infirmary, it is apparent that the underlying purpose of the board in operating the wood lot was to comply with the law.

As was said in *Orlando* v. *Brockton*, 295 Mass. 205, at page 209, "Where a comparatively insignificant income or benefit to a city incidentally results from the performance by public officers of a public duty, the dominating public character of their undertaking is not thereby changed and the city does not thereby become liable for negligence of such officers or of their employees in the performance of that duty." *Benton* v. *Boston City Hospital*, 140 Mass. 13, 17, 18. *Neff* v. *Wellesley*, 148 Mass. 487, 493, 494. *Curran* v. *Boston*, 151 Mass. 505, 509, 510. *Taggart* v. *Fall River*, 170 Mass. 325, 327. *Kelley* v. *Boston*, 186 Mass. 165. *Hale* v. *Williamstown*, 292 Mass. 319, 321. Where, as here, the income that was received from the sale of surplus products was so incidental to the public use, it cannot be said that it indicates any special corporate advantage, pecuniary profit

or commercial enterprise in the sense that the work done was in the nature of a business.

All sales of products, with the exception of eggs, were made at irregular intervals, "and only when a surplus had accumulated, and when it was good farm management to sell the product, rather than attempt to keep it." Eggs in addition to those needed and used at the farm were sold regularly, but these sales were found by the auditor to be so insignificant that they were only incidental. The farm was maintained "for the poor," and primarily the produce was for their use. It cannot be contended that the operation of the farm should have been such that there would never be any surplus products, and, based upon subsidiary findings that do not conflict, the express findings are that the disposition of such surpluses as there were did not put the town in business. The evidence, apart from the auditor's report, does not, in our opinion, warrant a different conclusion, nor does the fact that the town was reimbursed in some instances for wood that had been furnished in the circumstances disclosed. There is express statutory provision for reimbursement of a town for expenses incurred in relieving needy persons found therein who have lawful settlements elsewhere in the Commonwealth, and also in relieving poor persons who have no settlements within the Commonwealth. See G. L. (Ter. Ed.) c. 117, § 14, (now St. 1939, c. 39, § 1,) and § 18, (now St. 1938, c. 425). See *Curran* v. *Boston*, 151 Mass. 505, 509, 510.

The case is distinguishable from *Worden* v. *New Bedford*, 131 Mass. 23, *Collins* v. *Greenfield*, 172 Mass. 78, *Little* v. *Holyoke*, 177 Mass. 114, *Duggan* v. *Peabody*, 187 Mass. 349, *Dickinson* v. *Boston*, 188 Mass. 595, *Davies* v. *Boston*, 190 Mass. 194, *Kelmel* v. *Holyoke*, 280 Mass. 433, and *Sloper* v. *Quincy*, 301 Mass. 20.

3. There was no reversible error in admitting the evidence from the town records. It is apparent that at the trial one issue, at least, was whether the defendant was in control of the wood cutting. Corporate action by a town in the undertaking of some public project by its agents is frequently shown by vote, and the absence of such a vote is strong

evidence of the lack of such action. *Ryder* v. *Lexington,* 303 Mass. 281, 289. A vote expressly negativing a proposal ought to be all the more significant. But however this may be, in view of our conclusion as to the law, the plaintiffs were not harmed.

*Exceptions overruled.*