# LOUISE THIEDE v. TOWN OF SCANDIA VALLEY AND OTHERS.[1]

April 21, 1944.

No. 33,581.

[1]Reported in 14 N. W. (2d) 400.

*Austin L. Grimes,* for appellants.
*John E. Katzmarek* and *Edgar S. Young,* for respondent.

STREISSGUTH, JUSTICE.

This is an appeal from an order overruling a demurrer to plaintiff's complaint. The complaint incorporates, by reference,[2] certain proceedings for the determination of the plaintiff's legal settlement for poor relief purposes. Upon this appeal, the facts as alleged in the complaint and as disclosed by such records must be accepted as true. The story so told reads like a sequel to Steinbeck's "The Grapes of Wrath."

Louis Thiede and Louise Thiede, the plaintiff, are husband and wife. With their six minor children, they have resided in the defendant town continuously since October 22, 1938. During 1939, Louis Thiede, the husband, purchased a 40-acre tract in said town and built thereon a small dwelling house, which ever since has been the family home. The purchase of the homestead was completed in July 1941, the deed thereto being taken in the name of plaintiff.

Prior to March 1, 1935, the Thiedes were residents of North Dakota. On that date they left that state and moved to the town of Germania, Todd county, Minnesota, where they resided continuously until October 1, 1935. On the latter date they moved to the town

---

[2]While this is not good practice (41 Am. Jur., Pleading, § 59), no point is made of the irregularity.

of Fawn Lake in Todd county, continuing to reside therein until October 23, 1936. They then moved into the defendant town of Scandia Valley in Morrison county, living there continuously until April 27, 1938, when they returned to make their home in the town of Fawn Lake for a period of about six months. Their final move was made on October 22, 1938, when they again moved to the defendant town of Scandia Valley, which ever since that date has been their home.

Beginning in the month of December 1936 and continuing intermittently through the years 1937, 1938, and up to and including February 1939, the family received surplus commodities from the county of Todd. Beginning in the month of June 1937 and continuing intermittently through that year and 1938 and 1939, they received surplus commodities from Morrison county and direct relief from the Farm Security Administration of that county. During a period beginning in June 1938 and ending in March 1942, Louis Thiede, the head of the family, worked on WPA and received compensation therefor. Since March 1942, however, no member of the family has applied for or received public relief of any kind from any source.

By reason of the public relief so received, all the members of the family were, in legal contemplation, poor persons. The receipt of public relief in various forms during the periods referred to prevented their acquiring a legal settlement for poor relief purposes in the defendant town, notwithstanding the fact that they had acquired a homestead in that town in 1939 and lived thereon continuously thereafter.

In 1942 a dispute arose between the towns of Scandia Valley and Fawn Lake as to the legal settlement of the Thiede family. (Both towns operate on the town system of poor relief.) Proceedings were accordingly commenced pursuant to Minn. St. 1941, § 261.08 (Mason St. 1940 Supp. § 3161-1), for a judicial determination of the Thiede's place of settlement. The dispute was submitted to the district court of Morrison county, which, by an order dated April 10, 1942, found the facts as we have stated them and further found

and determined that, because the family had not lived continuously for more than one year in the town of Scandia Valley without receiving poor relief, the members thereof had not acquired a legal settlement therein, and that the family's legal settlement for poor relief purposes was in the town of Fawn Lake, where it had last resided for a continuous period of at least a year without receiving public relief. The court also found that Louis Thiede and his wife claimed the property upon which they lived as their homestead, that they claimed the right to continue to live thereon, and that they objected to being removed therefrom to the town of Fawn Lake.

In a memorandum attached to its order the court said:

"Except for the fact that the poor family has its homestead in the Town of Scandia Valley, it ought to be removed from the Town of Scandia Valley to the defendant Town of Fawn Lake pursuant to the provisions of Section 3161-2, Mason's Supplement 1940, unless the said Town of Fawn Lake shall in the meantime provide for the care of said poor family in the said Town of Scandia Valley, or unless the said Louis Thiede shall in the meantime voluntarily remove himself and wife and children from the said Town of Scandia Valley. *The Court's failure to provide for the removal of said family from the Town of Scandia Valley to the Town of Fawn Lake, pursuant to the provisions of Mason's Supplement 1940, is due wholly to the fact that the Court deems that it has no power herein to order the removal of said family from its homestead.* If under the law of this state the Court has such power, the judgment to be entered herein ought to provide for such removal.

"The defendant town [Fawn Lake] nevertheless must be ultimately liable for the support of said family so long as it maintains its status as poor persons under the provisions of our poor laws, or until it acquires a legal settlement elsewhere." (Italics supplied.)

On July 14, 1942, two months after the court's order, the two towns entered into a written stipulation which recited that the town of Fawn Lake did not have a suitable place within its corporate limits where it might care for the Thiede family and provide shelter for them, and that the town of Scandia Valley "is willing to

permit the above-named paupers to continue to reside there, upon condition that said defendant [town of Fawn Lake] now and hereafter continues to make proper provision for the care and maintenance of said paupers within and during such time as they continue to reside within the corporate limits of said plaintiff [town of Scandia Valley]." By this agreement, the town of Scandia Valley consented to permit the family to continue to reside within its corporate limits, "conditioned that during the entire period of such described residence, said paupers shall continue to remain as residents for poor purposes of the Town of Fawn Lake and said Town of Fawn Lake shall be legally responsible for any poor relief necessary for the support of said paupers during the entire period of such described residence."

Formal judgment in the settlement proceeding was entered on January 26, 1943. The judgment declared that Louis Thiede, his wife, and children were poor persons and that the town of Fawn Lake was their place of legal settlement for poor relief purposes. It also contained a provision that, pursuant to the stipulation above referred to, the town of Fawn Lake be allowed to care for the family in the town of Scandia Valley. It contained no provision for the removal of the family to Fawn Lake.

About the time the judgment was entered, the town of Fawn Lake tired of its bargain, or at least conceived the idea that it might, through legal strategy, be able to relieve itself of the burden of supporting the family. At any rate, on February 2, 1943, it served on the town of Scandia Valley a written notice dated January 28, 1943, reading as follows:

"You will now take notice, That the Town of Fawn Lake, Todd County, Minnesota, has now ceased to support the above named persons and ceases to be responsible for their care and support; that said Town of Fawn Lake does not recognize said persons as poor persons; that this Notice is sent you under and by virtue of Section 3 of Chapter 398 of the Laws of Minnesota for 1939 [Minn. St. 1941, § 261.09, Mason St. 1940 Supp. § 3161-2]."

The statute referred to in the notice reads as follows:

"The court, in its order determining said settlement, shall provide for the removal of said poor persons to their place of settlement as determined by said order; provided the court may, upon a proper showing by the political subdivision having the legal responsibility to support said poor persons, allow said political subdivision to care for said poor persons in another political subdivision, in which event said poor persons shall retain their legal settlement in the political subdivision found as determined by the order of the court until 30 days after it serves written notice upon the political subdivision where said poor persons are residing that it has ceased to support said persons and *the political subdivision where said poor persons are residing shall have the right upon 10 days written notice to said poor persons within said 30 day period to remove them to the political subdivision as determined by said order of the court.*" (Italics supplied.)

Following service of this notice and on February 5, 1943, Frank Cameron, one of the defendants, as chairman of that town, caused to be served upon the Thiedes a written notice, signed by Cameron as town chairman, directed to Louis Thiede and Louise Thiede, his wife, and to each of their six minor children, advising them of the action taken by the town of Fawn Lake and notifying them that by reason thereof, "you are hereby notified that within ten days after service of this notice upon you the officers of the undersigned township will remove you and each and every one of you from the Town of Scandia Valley, County of Morrison, State of Minnesota, to the Town of Fawn Lake, County of Todd, State of Minnesota, your place of poor settlement."

The Thiede family, feeling secure in their home, refused to move. The Scandia Valley officials waited 11 instead of 10 days, but on February 16, 1943, the town chairman delivered to the sheriff of Morrison county a written order requiring him to remove the family, together with their personal property and personal effects, from that town to the town of Fawn Lake on or before February 27, 1943. On the last day fixed in said notice, the sheriff served this order upon the Thiedes, and, between February 27 and March 3,

1943, the sheriff went upon their homestead and "with force and violence against the will and over the objections of the plaintiff, her husband and minor children removed all their personal property, consisting of their livestock, machinery, household goods and personal belongings, and forcibly \* \* \* evicted them and moved the plaintiff, her husband and minor children and their personal property and belongings into Fawn Lake Township, Todd County, Minnesota, and left \* \* \* and placed their personal property and belongings on the ground in the farm yard of plaintiff's mother-in-law." Within a few days, plaintiff, her husband, and children moved back to their homestead in Scandia Valley.

In the course of the removal of the family to the town of Fawn Lake, the house and other buildings on the Thiede homestead were damaged by persons engaged by the sheriff and the town officers. The removal was accomplished in sub-zero weather, and, as a direct and proximate result thereof, the plaintiff, her husband, and children suffered from extreme exposure and suffered great mental anguish, embarrassment, and loss of sleep. Plaintiff has become extremely nervous as a result of the experience and is likely to remain in that condition for a considerable length of time.

The complaint alleges that the eviction and removal was "malicious and wanton on the part of these defendants and each and all of them."

The question presented by the record is whether, assuming these facts to be true, the town and its officials can be held responsible for the damage resulting to the plaintiff by her forcible removal from her homestead. The liability of the town, if any, is distinct from that of the individual defendants, who constituted its board of supervisors and who were *ex officio* its "superintendents of the poor." Minn. St. 1941, § 263.01 (Mason St. 1927, § 3184).

■ The entire social and political structure of America rests upon the cornerstone that all men have certain rights which are inherent and inalienable. Among these are the right to be protected in life, liberty, and the pursuit of happiness; the right to acquire, possess, and enjoy property; and the right to establish a home and family

relations—all under equal and impartial laws which govern the whole community and each member thereof. 2 Story, The Constitution (5 ed.) § 1934; 12 C. J., Constitutional Law, §§ 458, 459; 16 C. J. S., Constitutional Law, §§ 208, 209; 11 Am. Jur., Constitutional Law, §§ 328, 329; 12 Am. Jur., Constitutional Law, § 456, *et seq.;* United States v. Wheeler, 254 U. S. 281, 293, 41 S. Ct. 133, 65 L. ed. 270. The rights, privileges, and immunities of citizens exist notwithstanding there is no specific enumeration thereof in state constitutions. "These instruments measure the powers of rulers, but they do not measure the rights of the governed." 1 Cooley, Constitutional Limitations (8 ed.) pp. 95, 533; 2 Story, The Constitution (5 ed.) § 1938; Allen v. Pioneer-Press Co. 40 Minn. 117, 122, 41 N. W. 936, 3 L. R. A. 532, 12 A. S. R. 707; Ekern v. McGovern, 154 Wis. 157, 237-239, 142 N. W. 595, 618, 46 L.R.A.(N.S.) 796; Dennis v. Moses, 18 Wash. 537, 52 P. 333, 40 L. R. A. 302. "The fundamental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred." Wilkinson v. Leland, 2 Pet. (U. S.) 627, 657, 7 L. ed. 542. Government would not be free if they were not so held.

The constitution of Minnesota specifically recognizes the right to "life, liberty or property" (art. 1, § 7), but does not attempt to enumerate all "the rights or privileges secured to any citizen thereof" (see art. 1, § 2). It, however, significantly provides: "The enumeration of rights in this constitution shall not be construed to deny or impair others retained by and inherent in the people." (Art. 1, § 16.)

"Every man's house is his castle" is more than an epigram. It is a terse statement, in language which everyone should understand, of a legal concept older even than Magna Charta. (See Broom's Legal Maxims [10 ed.] p. 281; Town of Dummerston v. Town of Newfane, 37 Vt. 9; 1 Cooley, Constitutional Limitations [8 ed.] p. 611.) The maxim has found expression, in various forms, in the Declaration of Independence, and in the Bills of Rights in our federal and state constitutions. A man's right to occupy his home is inviolable, irrespective of the meagerness or abundance of his

wealth.[3] " 'Indigence' in itself is neither a source of rights nor a basis for denying them." Jackson, J., in Edwards v. California, 314 U. S. 160, 184, 62 S. Ct. 164, 172, 86 L. ed. 119, 131.

In recognition of these principles, both American and English courts for centuries have uniformly declared that the owner of a freehold cannot, without his consent, be removed therefrom to his legal settlement for poor relief purposes in another municipality. And this, notwithstanding general statutory language such as that contained in Minn. St. 1941, § 263.03 (Mason St. 1940 Supp. § 3186), authorizing the removal of paupers to their place of settlement. 48 C. J., Paupers, § 142; Robinette v. Price, 214 Minn. 521, 8 N. W. (2d) 800; Inhabitants of Somerset v. Inhabitants of Dighton, 12 Mass. 383; Town of Londonderry v. Town of Acton, 3 Vt. 122; Town of Dummerston v. Town of Newfane, 37 Vt. 9, *supra;* Town of Peacham v. Town of Waterford, 46 Vt. 154; Inter The Parishes of Ryslip and Harrow [Hill. 8 Will. 3 B. R.] 2 Salkeld's Rep. 524.

The defendants, in seeking to justify their disregard of this rule, rely upon the provisions of Minn. St. 1941, § 261.09 (Mason St. 1940 Supp. § 3161-2), as expressly giving the town of Scandia Valley "the right, upon ten days' written notice to the poor persons," to remove them to the town of their legal settlement within 30 days after such town serves notice that "it has ceased to support these persons." That the words of the statute support this contention is obvious from a reading thereof. No exception is therein made of cases where the poor person has acquired and occupies a freehold. But, insofar as the statute runs counter to the fundamental law of the land, it is superseded thereby, notwithstanding the statute unquestionably was aimed at solving a rather perplex-

---

[3]The eloquent passage in the Earl of Chatham's (William Pitt) speech on General Warrants is familiar: "The poorest man may, in his cottage, bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England may not enter; all his force dares not cross the threshold of the ruined tenement," quoted in 1 Cooley, Constitutional Limitations (8 ed.) p. 611, note 1; Allen v. State, 183 Wis. 323, 197 N. W. 808, 39 L. R. A. 782.

ing social and economic problem. Edwards v. California, 314 U. S. 160, 62 S. Ct. 164, 86 L. ed. 119, *supra*. Statutes must always be construed consistently with constitutional mandates. 6 Dunnell, Dig. & Supp. § 8931. Hence, the statute under consideration cannot be construed as permitting the removal of poor persons who, the fundamental law says, are secure against removal while occupying their own freehold.

The fact that the declaration in Magna Charta that no man shall be disseized of his freehold except for crime was not incorporated in our constitution does not prevent us from recognizing that principle as one of fundamental law, for as said in Town of Dummerston v. Town of Newfane, 37 Vt. 9, 14, *supra:*

"* * * the rule forbidding the removal of a person as a pauper from his freehold estate is a rule of humanity and policy. It is a tribute of respect to the feelings with which a person regards that which is his own,—to the attachment which is cherished for the associations of home and family,—and to the influences which connect the memories of better and more prosperous days with local scenes. It is a rule resting upon the best feelings of our nature for its foundation, and we think that the provisions in Magna Charta, which has been referred to, was intended not so much to confer a new privilege as to recognize one already existing."

The rule has its practical advantages too, for, as the Vermont court pointed out in the Town of Londonderry case, 3 Vt. 122, 129, "nothing would have a greater tendency to reduce men to pauperism than to remove them from their homes and property, and thus compel them to dispose of that property at any price they could get."

Legal settlement for the purposes of poor relief is not the equivalent of legal residence. It is the latter and not the former that determines a man's right to vote in a community, to serve on juries, and to exercise the customary privileges of citizenship. These privileges are inherent in citizenship and are not forfeited by seeming loss of caste in applying for poor relief.

"* * * It would be a solecism in political science, that a man should be an independent freeholder, eligible to those official stations which it has been thought inexpedient to intrust to any except the owners of the soil, capable of sitting in the jury box, determining upon the lives, liberties and properties of his fellow citizens, and yet liable to be transported from town to town, as a pauper, until he is left in some town where accident has fixed the place of his settlement, there to be subject to the control of the overseers of the poor who are to take effectual measures to prevent him *'from strolling into any other town or place.'* " Town of Londonderry v. Town of Acton, 3 Vt. 122, 130, *supra.*

So it is now generally recognized that nonsettlement in a municipality is not the sole test of removability therefrom. Robinette v. Price, 214 Minn. 521, 8 N. W. (2d) 800, *supra;* The King v. Inhabitants of Brington, 7 B. & C. 546, 550; Town of Londonderry v. Town of Acton, 3 Vt. 122, 131, *supra;* Inhabitants of Granby v. Inhabitants of Amherst, 7 Mass. 1; Inhabitants of Salem v. Inhabitants of Andover, 3 Mass. 436; The King v. Inhabitants of Martley, 5 East 39. "Settlement" fixes the financial responsibility for the support of a poor person as between governmental subdivisions and is determined by length of such person's residence and self-supporting status in each subdivision, while "irremovability" is determined by present ownership of a freehold or present self-supporting status regardless of its longevity.

█ Paupers, unlike leopards, can change their spots. A man may be declared a pauper one day and, through a break in his fortunes, change his status the next. And if such person acquires a freehold, or, through employment, gift, inheritance, or otherwise, becomes self-supporting between the time his legal settlement has been determined and the time when it is sought to remove him to the place of his legal settlement, he cannot be removed though his legal settlement has not changed. Lucht v. Bell, 214 Minn. 318, 8 N. W. (2d) 26; Inhabitants of Cornish v. Inhabitants of Parsonfield, 22 Me. 433; Tompkins County v. Ontario County, 92 Misc. 272, 156 N. Y. S. 335. This principle is peculiarly applicable here, because

it appears that the Thiedes had neither applied for nor received public aid in any form from any source for over ten months prior to their removal to the town of Fawn Lake.

■ It should also be observed that the Thiedes were not parties to the proceedings for the determination of their legal settlement. That litigation was between the towns of Fawn Lake and Scandia Valley. Not being a party to the proceedings, plaintiff here was not bound by the court's determination of her legal settlement. In re Settlement of Cegon, 212 Minn. 75, 2 N. W. (2d) 433; Inhabitants of Shirley v. Inhabitants of Lunenburg, 11 Mass. 379.

■ More respect for the common rights of man and less regard for the condition of the public exchequer may result in a more humane administration of our poor laws. Enlightened civilization no longer regards poverty as a "moral pestilence" as it once was regarded (see City of New York v. Miln, 11 Pet. [U. S.] 102, 142, 9 L. ed. 648), nor does it group paupers with "vagabonds and fugitives from justice," as did the Articles of Confederation (art. IV). Today the care of the less fortunate members of our society is universally regarded as a proper governmental function or duty to be assumed in the interest of general welfare. Why should not such duty be accepted willingly by the public officers administering public relief, even though their community may, by comparison with others, be bearing more than the average "load"? The protection afforded by our form of government is not merely fair-weather shelter. It may not be minified by reasons of temporary economic expediency. "Those men who enjoy the blessings of liberty must, like men, undergo the fatigues of supporting it." Thomas Paine's Complete Works, Vol. 2, p. 135. Our poor should not be mere pawns in a game of "settlement" between two contesting municipalities; and when, as here, a man and his wife have acquired a home within the limits of one town and have become self-supporting, a checkmate should be called on any attempt to remove them to another town, though such other town has been adjudged to be the place of their legal settlement.

It would seem that ordinary regard for the sanctity of the home would have suggested to the individual defendants the truth of these principles which we now restate.  But, as Thomas Hood once animadverted:

> "Alas! for the rarity
> Of Christian charity
> Under the sun."

One would think that the defendants would not have attempted a summary removal of plaintiff and the members of her family from their home, especially in the face of the "Stop" signal in the original court order determining settlement.  In that order, the trial court had expressed its own serious doubt as to the right to remove plaintiff from her home and had significantly omitted any directions as to such removal.  But this warning met the reception of Cassandra's later prophecies and went wholly unheeded.

So far as the liability of the individual defendants is concerned, it follows from what we have said that they are responsible to plaintiff for all actual damages proximately resulting to her from their unlawful acts.  Our constitution (art. 1, § 8) expressly provides: "Every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive in his person, property or character."  "These words were not inserted in the constitution as a matter of idle ceremony, or as a 'string of glittering generalities'" (Rhodes v. Walsh, 55 Minn. 542, 57 N. W. 212, 213, 23 L. R. A. 632), and must be respected even by public officers.

Immunity from suit is a high attribute of sovereignty, a rudimentary survival of the common-law maxim, "The King can do no wrong."  The immunity is a prerogative of the state itself, which cannot be invoked by public officers or agents when sued for their own torts.  5 Dunnell, Dig. & Supp. § 8001.  True, a public officer charged with duties which call for the exercise of his judgment or discretion as to the propriety or the manner in which it is to be performed is not liable to a private individual for damages unless guilty of wilful or malicious wrong.  *Id.*  This rule has frequently applied to actions against health officers or officers charged with

the duty of caring for the poor, where the action was based on nonfeasance or misfeasance, as distinguished from malfeasance. Wood v. Boone County, 153 Iowa 92, 133 N. W. 377, 39 L.R.A.(N.S.) 168, Ann. Cas. 1913D, 1070; Butler v. Kansas City, 97 Kan. 239, 155 P. 12, L. R. A. 1916D, 626, Ann. Cas. 1918D, 801; 25 Am. Jur., Health, § 17; Mechem, Public Officers, § 613; Throop, Public Officers, § 722, p. 685. But liability for affirmative acts of misconduct or acts beyond the scope of an officer's authority do not stand on the same footing as nonfeasance or misfeasance. 5 Dunnell, Dig. & Supp. § 8001; 25 Am. Jur., Health, § 17; Throop, Public Officers, § 614. The officer's protection given to him by the law is a shield to protect him against honest mistakes in judgment; it is not a sword with which to strike down constitutional rights of citizens. As in the case of illegal arrests, the officer is bound to know these fundamental rights and privileges, and must keep within the law at his peril. Mechem, Public Officers, § 770. Our constitution furnishes a guaranty against any encroachment by public officers or others upon the basic rights which belong to every citizen as a member of society.

The alleged misconduct of the individual defendants in the instant case constituted a trespass upon plaintiff's property and an assault upon her person, for both of which the law furnishes a remedy. The complaint must be held to state a cause of action against the supervisors of the defendant town, irrespective of any allegations of wilfulness, wantonness, or malice. Such allegations are important only in determining their liability for exemplary as opposed to compensatory damages.

There may have been extenuating circumstances attending the removal of plaintiff from her homestead which can be shown at the trial upon the merits. Her voluntary consent would constitute a complete defense to the action (In re Settlement of Cegon, 212 Minn. 75, 2 N. W. [2d] 433); but, absent consent, good faith alone on the part of the defendants cannot prevent a recovery by her for all actual damages, including mental anguish, sustained by her as the proximate result of the officers' unlawful acts. And, if wilful-

ness, wantonness, and malice on their part be shown, plaintiff is entitled to both compensatory and punitive damages.

■ The question of the responsibility of the town of Scandia Valley for the acts of its superintendents of the poor is a more perplexing question.

At early common law there was no legal obligation on any of the instrumentalities of the state to furnish relief to paupers. Matters of charity were thought more appropriate for the church. Cerro Gordo County v. Boone County, 152 Iowa 692, 133 N. W. 132, 39 L.R.A.(N.S.) 161, Ann. Cas. 1913C, 79, and note 82. It was, however, recognized early in the history of our country that it was not only competent but necessary for a state, through governmental agencies, to make some provision for the relief of its poor. City of New York v. Miln, 11 Pet. (U. S.) 102, 142, 9 L. ed. 648. The furnishing of such relief is now universally considered as a proper exercise of the police power in the promotion of the general welfare. 41 Am. Jur., Poor and Poor Laws, § 13. The promotion of the general welfare is, however, the paramount duty of the state and not its subdivisions. It involves the exercise of purely governmental, as distinguished from local or proprietary, functions. Wood v. Boone County, 153 Iowa 92, 133 N. W. 377, 39 L.R.A.(N.S.) 168, Ann. Cas. 1913D, 1070; Twyman's Admr. v. Bd. of Council of Frankfort, 117 Ky. 518, 78 S. W. 446, 64 L. R. A. 572, 4 Ann. Cas. 622, and note; 41 Am. Jur., Poor and Poor Laws, § 13; Annotation, 134 A. L. R. 763; Ann. Cas. 1913C, 83; Ann. Cas. 1918D, 810; 4 Dillon, Municipal Corporations (5 ed.) § 1661. This was but recently emphasized by the Supreme Court of the United States thus:

"* * * The notion that each community should care for its own indigent, that relief is solely the responsibility of local government * * * no longer fits the facts. Recent years, and particularly the past decade, have been marked by a growing recognition that in an industrial society the task of providing assistance to the needy has ceased to be local in character.

"* * * in not inconsiderable measure the relief of the needy has

become the common responsibility and concern of the whole nation." Edwards v. California, 314 U. S. 160, 174, 62 S. Ct. 164, 167, 86 L. ed. 119, 126.

Officers and agents to whom the duty of caring for the poor is delegated are, accordingly, in the exercise of their powers in this respect, the representatives of the state itself, and not of its local or subordinate subdivisions. Bryant v. City of St. Paul, 33 Minn. 289, 23 N. W. 220, 53 Am. R. 31; City of New Bedford v. Inhabitants of Taunton, 91 Mass. (9 Allen) 207; City of Denver v. Porter (8 Cir.) 61 C. C. A. 168, 126 F. 288; 37 Am. Jur., Municipal Corporations, § 114. Where the town system prevails, the supervisors of the town are *ex officio* the "superintendents of the poor." Minn. St. 1941, § 263.01 (Mason St. 1927, § 3184). But, in administering the poor laws, they act, not as agents of the town, but as officers of the state. This is true notwithstanding that the duty of furnishing "support or relief" is, by another statute (*Id.* § 261.03 [§ 3159]), cast upon the town. Bryant v. City of St. Paul, *supra.*

The duties and acts of the town officers in administering the poor laws being strictly public and governmental in their nature, it follows that, in the absence of statute, no liability attaches to the town either for nonuse or misuse of their powers by the officers or their agents or servants. 4 Dunnell, Dig. & Supp. §§ 6808, 6809; 26 Minn. L. Rev. 294, 336, 343; 38 Am. Jur., Municipal Corporations, §§ 572, 573; 41 Am. Jur., Poor and Poor Laws, §§ 13, 15; 4 Dillon, Municipal Corporations (5 ed.) § 1643; Mechem, Public Officers, § 613; 6 McQuillin, Municipal Corporations (2 ed.) § 2839; Throop, Public Officers, § 551, at p. 523, and § 593, at p. 556; Wood v. Boone County, 153 Iowa, 92, 133 N. W. 377, 39 L.R.A.(N.S.) 168, Ann. Cas. 1913D, 1070; Twyman's Admr. v. Board of Council of Frankfort, 117 Ky. 518, 78 S. W. 446, 64 L. R. A. 572, 4 Ann. Cas. 622, *supra;* Chaffee v. Town of Oxford, 308 Mass. 520, 33 N. E. (2d) 298, 134 A. L. R. 756, and note.

The fact that the town of Scandia Valley may have derived substantial pecuniary benefits from the removal of a potential pauper from its limits should not change the general rule of non-

liability, notwithstanding that some courts make special benefit one of the tests of municipal liability. Nor should liability be cast upon a town or county administering poor relief for torts of its poor officers because the administration of such relief has to some extent become localized and is to some extent locally financed. The dominating public character of the administration of poor laws is not changed by the fact the municipality has an incidental financial interest therein. Bryant v. City of St. Paul, 33 Minn. 289, 23 N. W. 220, 53 Am. R. 31, *supra;* Orlando v. City of Brockton, 295 Mass. 205, 3 N. E. (2d) 794.

Mechem in his work on Public Officers, § 850, in dealing generally with the immunity of municipalities from suit, makes an excellent summary of the views we have expressed:

"The same immunity, except where otherwise declared by express enactment, extends to municipal corporations for the torts of such of its public officers, who, though appointed or elected, and paid by it, are yet charged with the performance of a public service in which the corporation as such has no particular interest and from which it derives no special benefit or advantage in its corporate capacity, but which it is bound to see performed in pursuance of a duty imposed by law for the general welfare of the inhabitants or of the community.

"The power intrusted to the corporation in such cases is intrusted to it as one of the political divisions of the State, and it is conferred not for the immediate benefit of the municipality, but as a means to the exercise of the sovereign power for the benefit of all citizens. The officers who exercise this power are not then the agents or servants of the municipality, but are public officers, agents or servants of the public at large, and the corporation is not responsible for their acts or omissions nor for the acts or omissions of the subordinates appointed by them."

Applying this rule, we hold that the demurrer interposed by the town of Scandia Valley should have been sustained.

Affirmed as to individual defendants, reversed as to defendant town.