**Edward J. RICO, Petitioner,**

v.

**STATE of Minnesota et. al, Respondents.**

No. C5–90–397.

Supreme Court of Minnesota.

June 21, 1991.

Mark L. Seeger, William Starr & Associates, Minneapolis, for petitioner.

Hubert H. Humphrey, III, Atty. Gen., Alan C. Page, Asst. Atty. Gen., St. Paul, for respondents.

KEITH, Chief Justice.

Following his removal from an unclassified position as Assistant to the Commissioner of the Minnesota Department of Veterans Affairs, petitioner Edward J. Rico brought this action against respondents, the State of Minnesota and William J. Gregg, the Commissioner of Veterans Affairs, alleging breach of an employment contract and wrongful discharge in retaliation for expressing concerns about the operation of the Department of Veterans Affairs. The trial court granted summary judgment on Rico's breach of contract claim but refused to dismiss the retaliatory discharge claim. Later the trial court denied respondent's second summary judgment motion based on governmental, official, and qualified immunity doctrines. Upon the joint appeal of the state and Gregg from the order denying the second summary judgment motion pursuant to *Anderson v. City of Hopkins*, 393 N.W.2d 363 (Minn.1986), the court of appeals, interpreting the wrongful discharge claim as an action brought under 42 U.S.C. § 1983, dismissed Rico's complaint because the state and its employees acting in their official capacity are not persons amenable to suit under section 1983. Because we find that the state and Gregg are entitled to governmental immunity under the discretionary function exception in the Minnesota Tort Claims Act, Minn.Stat. § 3.736, subd. 3(b) (1990), and that Gregg is entitled to official immunity, we affirm.

I

Edward J. Rico began working for the State of Minnesota in January 1975 at the Faribault State Hospital. Within weeks he was transferred to St. Paul. Rico rose through the ranks of state government: from an unemployment claims representative, to a personnel officer, later to a senior personnel officer, to Personnel Director I at Moorhead State University, and then to Personnel Director II at Cambridge State Hospital. In 1983, Rico secured a transfer to St. Paul as Personnel Director I and later as Personnel Director II, both classified positions in the Department of Veterans Affairs (DVA).

In 1984, a legislator suggested to Commissioner William Gregg that he promote Rico because Rico's lobbying efforts had been instrumental in the passage of legislation affecting the department. Commissioner Gregg processed a request to promote Rico to Personnel Program Manager, a position within the classified service. The Department of Employee Relations rejected the request and suggested that DVA create an unclassified position to give Rico more management responsibility.

Rico then prepared a letter dated September 21, 1984, for Commissioner Gregg's signature to the Department of Employee Relations requesting that his classification be changed from Personnel Director II to Assistant to the Commissioner, an unclassified position. According to the letter, the nature of Rico's position changed from performing personnel matters to administration at the managerial level—"Mr. Rico shares fully in the management of the Department and makes program as well as administrative decisions." An audit review approved the creation of Rico's unclassified position effective October 22, 1984. This review determined that Rico's department-wide policy development and implementation function, budget and legislative activities, and supervision and management responsibilities were comparable to Assistant to the Commissioner positions in other departments. Rico took a leave of absence from his then-abolished classified Personnel Director II position to accept the newly-created unclassified position.

By late 1985, Rico's relationships with several coworkers began to deteriorate. Rico attributed the fallout to his complaints about illegalities and improprieties within the DVA including the receipt of gifts by DVA employees in exchange for lobbying efforts, irregularities in expense account reporting, improper salary increases for undeserving employees, and administrative and fiscal mismanagement at the Minnesota Veterans Home. The state alleges that these issues had been discovered in already-released audit reports and that Rico actually participated in, or at least turned his head to some of the improprieties. Rico's superiors, Commissioner Gregg and Deputy Commissioner Jeffrey Olson, attributed the counterproductive work atmosphere to Rico's personality clashes with coworkers and department constituents, his attempts to undermine the department, his initiation of heated arguments in staff meetings, and his continued threats and allegations. In March 1986, Gregg and Olson decided to transfer Rico's offices from the DVA building to the Minnesota Veterans Home, according to Olson, because they felt Rico had "burned most of his bridges in state employment" and he needed a position with less personal contact.

According to Rico, dissatisfied with DVA officials' responses to his concerns and allegations, he met on July 8, 1986, with Governor Perpich's Chief of Staff, Gregg and Olson, to raise his concerns again. The state claims that Rico called the meeting not to discuss departmental improprieties but for personal gain. Rico admits that at the meeting he asked for a transfer to another department and discussed his demand for a salary increase. In a letter dated July 25, 1986, Gregg notified Rico of his removal from the Assistant to the Commissioner position effective August 19, 1986. Rico alleges that he was fired in retaliation for expressing his concerns about serious issues regarding the management of state government. In his deposition, Olson asserted the basis for the termination as follows:

Olson: [W]e had determined that the ongoing problems of Mr. Rico's personality, his interpersonal relationships with other employees, members of our veterans constituency, threats and allegations, were not consistent with the type of department that we wanted to run.

Q: Were there any other considerations that went into the decision to let him go?

Olson: We also discussed whether or not we needed an Assistant to the Commissioner, if the workload was really great enough to justify the position.

Q: And what conclusion did you come to?

Olson: No.

Q: Did anything else go into the decision to let him go?

Olson: Not really.

Q: When was the decision made to let him go?

Olson: Mid–June.

Rico was not fired from state employment. Because he was on leave of absence from his since-abolished Personnel Director

II position, Rico had rights to "bump" the least senior Personnel Director I in the department. Although there was no Personnel Director I position within the department, Rico also was eligible to bump the least senior Personnel Officer, Senior within the department. Rico did not exercise this option, and has been on layoff status since his removal from the Assistant to the Commissioner position.

## II

■ The court of appeals, interpreting Rico's retaliatory discharge claim as an action under 42 U.S.C. § 1983, dismissed the claims against the state and Gregg because the state and its officers acting in their official capacities are not persons amenable to suit under section 1983. *Rico v. State*, 458 N.W.2d 738, 740–41 (Minn.App.1990); *see Michigan v. Will*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). The state's and Gregg's unamenability to suit under section 1983, however, is not dispositive of whether Rico may maintain actions against the state and Gregg under any common law theory including retaliatory discharge. *See Johnson v. Morris*, 453 N.W.2d 31, 41–42 (Minn.1990) (distinguishing official immunity from section 1983 qualified immunity while analyzing state law claims which arose from same set of facts as section 1983 claims); *see also Elwood v. Rice County*, 423 N.W.2d 671, 677 (Minn.1988). Thus, if Rico states a valid retaliatory discharge claim, which we assume given the procedural posture of this case, we must determine if the state and/or Gregg are entitled to any statutory or common law immunities.

## III

Until 1976, the doctrine of sovereign immunity, with several exceptions, prevented suits against the state without its consent. In the Minnesota Tort Claims Act, the legislature waived its governmental tort immunity by creating a general rule of liability "where the state, if a private person, would be liable to the claimant." Minn. Stat. § 3.736, subd. 1 (1990). The waiver of immunity is subject to the discretionary function exception, which provides that "the state and its employees are not liable for * * * a loss caused by the performance or failure to perform a discretionary duty, whether or not the discretion is abused." Minn.Stat. § 3.736, subd. 3(b) (1990).

Although almost every government function involves some degree of discretion, we have recognized that the legislature did not intend the discretionary function exception to nullify the general rule of liability. *Holmquist v. State*, 425 N.W.2d 230, 231 (Minn.1988). To determine which government functions remain immunized, we have examined the purpose of the discretionary function exception. *Id.* The discretionary function exception is designed to preserve the separation of powers by insulating executive and legislative policy decisions from judicial review through tort actions. *Nusbaum v. County of Blue Earth*, 422 N.W.2d 713, 718 (Minn.1988) (citing W. Keeton, Prosser and Keeton on Torts § 131, at 1039 (5th ed.1984); 5 K. Davis, Administrative Law Treatise § 27.11, at 60–62 (2d ed. 1984)).

Our cases have distinguished between government action at the planning level (generally protected) and at the operational level (generally unprotected). *Holmquist*, 425 N.W.2d at 232; *Nusbaum*, 422 N.W.2d at 719–720. We have used this distinction, however, only as a means to focus on the central inquiry: whether the challenged government conduct involves a balancing of policy considerations. *Nusbaum*, 422 N.W.2d at 722. We have recognized that decision-making at the planning level usually involves policy considerations and thus is entitled to protection. Sometimes implementation of the policy also involves balancing of policy considerations. "More often, however, implementation simply involves applying an established policy to a particular fact situation and is, therefore, unprotected * * *." [1] *Holmquist*, 425 N.W.2d at 234 (quotations omitted).

---

1. Interpreting the similarly-phrased discretionary function exception to the Federal Tort Claims Act, the United States Supreme Court recently rejected the planning/operational level

■ Applying these principles, the state and Gregg are entitled to governmental immunity under the discretionary function exception. Rico, as Assistant to the Commissioner, was part of Commissioner Gregg's management team—an unclassified employee with a substantial role in formulating and implementing departmental policy. Rico's job description states that he was "[t]o assist the Commissioner in the management of the Department of Veterans Affairs" and "[t]o review, plan and recommend changes in policies, procedures and organizational structure * * *." Moreover, the statutory criteria for the creation of additional unclassified positions, such as Rico's position, exhibit a substantial policy-making role and reflect the need for loyalty to and compatibility with the governor and Commissioner Gregg.[2]

A challenge to the decision to fire an unclassified, policy-making official necessarily challenges the administration's development and implementation of policy. The decision to fire an unclassified member of a commissioner's management team demands policy considerations—Are this official's recommendations in line with the governor's policies? Is this official carrying out the governor's policies? Does this official's conduct in office reflect the standards set by the governor? Is the official undermining the effectiveness of the governor's policies?

The governor establishes policy through the commissioners and through the unclassified employees who are part of the management team. The authority to choose the top leaders in the administration—and accordingly also to remove them—is essential to effectuate the governor's public policy goals. Consequently, the job security of these high-level government officials traditionally has been subject to the ebb and flow of political tides and public opinion.

The decision to remove an unclassified policy-making official does not involve merely the implementation of an established policy. Cf. Nusbaum, 422 N.W.2d at 723 (holding that the discretionary function exception does not protect against a challenge to the negligent implementation of a government policy because the suit does not question the wisdom of the policy); see also Berkovitz v. United States, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988) (holding that "the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow."). An unclassified policy-making official's wrongful discharge action is a direct challenge to the administration's formulation of public policy. The governor and the commissioners pursue their policy goals when making decisions about who to hire and who to retain

dichotomy. *United States v. Gaubert*, —— U.S. ——, ——————, 111 S.Ct. 1267, 1274–75, 113 L.Ed.2d 335 (1991). In addition to planning-level decisions, which are clearly protected by the discretionary function exception, also protected may be decisions at the operational level "involving the necessary element of choice and grounded in social, economic, or political goals." *Id.* —— U.S. at ——, 111 S.Ct. at 1274. The Court emphasized that "'it is the nature of the conduct, rather than the status of the actor' that governs whether the exception applies." *Id.*, —— U.S. at ——, 111 S.Ct. at 1275 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984)). Justice Scalia agreed with the Court's rejection of the planning/operational dichotomy, but expressed his view that "the level at which the decision is made is often *relevant* to the discretionary function inquiry." *Id.* —— U.S. at ——, 111 S.Ct. at 1280 (Scalia, J., concurring (emphasis in original)). Justice Scalia's approach is thus similar to our discretionary immunity analysis.

2. The legislature has included specified positions in the unclassified service and also provided for the creation of additional unclassified positions when certain criteria, including the following, are met:

(2) the person occupying the position would report directly to the agency head or deputy agency head and would be designated as part of the agency head's management team;

(3) the duties of the position would involve significant discretion and substantial involvement in the development, interpretation, and implementation of agency policy;

* * * * * *

(5) there would be a need for the person occupying the position to be accountable to, loyal to, and compatible with the governor and the agency head, or the employing constitutional officer;

Minn.Stat. § 43A.08, subd. 1a (1990).

in the administration's management team. The legislature included the discretionary function exception in the Tort Claims Act to prevent judicial review of these types of decisions.

Apparently conceding that the decision to remove an unclassified policy-making official involves a balancing of policy considerations, counsel argued that a competing policy—that employers may not fire employees in retaliation for disclosing illegalities and inefficient use of public funds—precluded protection of the discretionary function exception. Rico raises legitimate concerns: that the public deserves to know when government officials violate the law or commit other improprieties, and that employees should not be fired for raising these issues.

█ The public, however, is not without protection. Elected officials, in this case the governor, are accountable at the polls for their own actions as well as the actions of their appointed officials. The governor may suffer political repercussions when a member of the administration's policy-making team is fired for exposing government illegalities or improprieties. Furthermore, the legislature, by excepting discretionary functions from the waiver of sovereign immunity, recognized that it was sacrificing some of the valuable aspects of tort actions against the state and its officers. The

plain language of the discretionary function exception protects discretionary governmental actions whether or not the government or its officers act properly. Minn.Stat. § 3.736, subd. 3(b). The legislature thus determined that the benefits of immunity for policy-based decisions outweighed the harm to those deserving plaintiffs who would be barred from bringing an otherwise meritorious claim.[3]

Our function is to determine which government functions the legislature intended to exclude from the waiver of sovereign immunity. Having determined that the challenged government activity—the decision to remove an unclassified policy-making official—involves a balancing of policy considerations, the government is entitled to immunity whether or not the government's action was proper in this particular case. The government's decision to remove Rico, an unclassified policy-making employee, is thus protected by the discretionary function exception in the Minnesota Tort Claims Act.

## IV

█ We also hold that Gregg is entitled to protection under the common law doctrine of official immunity.[4] The doctrine of official immunity protects from personal liability a public official charged by law with duties that call for the exercise

**3.** In 1987 the legislature passed the Whistleblower Act, which created a cause of action for an employee who is discharged because she or he "in good faith, report[ed] a violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official." Act of May 11, 1987, ch. 76, 1987 Minn.Laws 140, *codified at* Minn.Stat. § 181.932 (1990). The legislature included the state in the definition of an employer that is subject to suit under the Act. Minn.Stat. § 181.931, subd. 3 (1990).

We need not decide whether the Whistleblower Act waived the state's immunity in retaliatory discharge actions brought by unclassified employees who are members of the administration's policy-making team. The legislature passed the statute after Rico's cause of action arose, and we will not apply retroactively a waiver of immunity. *See Nieting v. Blondell,* 306 Minn. 122, 132, 235 N.W.2d 597, 603 (1975).

**4.** Although the discretionary function exception in the Tort Claims Act protects from liability "the state and its employees," a public official

sued individually for his or her own torts still may be subject to liability unless entitled to protection under the common law doctrine of official immunity. *Theide v. Town of Scandia Valley,* 217 Minn. 218, 230, 14 N.W.2d 400, 408 (1944) ("[I]mmunity is a prerogative of the state itself, which cannot be invoked by public officers or agents when sued for their own torts."). The discretionary function exception represents an exception to the state's waiver of its sovereign immunity. This exception to the waiver of sovereign immunity includes protection for the employee because the state is required to indemnify the employee for acts and omissions committed within the scope of employment except "in case of malfeasance in office or willful or wanton actions or neglect of duty." Minn. Stat. § 3.736, subd. 9 (1990). In instances where the employee is not indemnified, the employee's only potential shield is official immunity.

of judgment or discretion unless the official is guilty of a wilful or malicious wrong. *Elwood v. County of Rice*, 423 N.W.2d 671, 677 (Minn.1988). Although the discretionary function exception to the Tort Claims Act and the official immunity doctrine both protect discretionary acts, the discretionary acts protected by each are not identical. Governmental immunity under the discretionary function exception and official immunity serve different purposes: governmental immunity "is designed to preserve the separation of powers," whereas official immunity primarily is "intended to insure that the threat of potential liability does not unduly inhibit the exercise of discretion required of public officers in the discharge of their duties." *Holmquist v. State*, 425 N.W.2d 230, 233 n. 1 (Minn.1988). Thus, discretion has a broader meaning in the context of official immunity. *Elwood*, 423 N.W.2d at 678.

■ In defining the scope of official immunity, we have distinguished between the performance of discretionary duties—which is immunized, and ministerial duties—for which officers remain liable. The court has described an official's duty as ministerial "when it is absolute, certain and imperative, involving merely execution of a specific duty arising from fixed and designated facts." *Cook v. Trovatten*, 200 Minn. 221, 224, 274 N.W. 165, 167 (1937) (citations omitted). Under these standards, the decision to remove an unclassified policy-making employee, who may be discharged at any time without reason, is discretionary rather than ministerial.

■ Official immunity also differs from governmental immunity in that the official immunity doctrine does not protect the officer who commits a wilful or malicious wrong. *Compare Elwood*, 423 N.W.2d at 679 *with* Minn.Stat. § 3.736, subd. 3(b) (1990). Malice "means nothing more than the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right." *Carnes v. St. Paul Union Stockyards Co.*, 164 Minn. 457, 462, 205 N.W. 630, 631 (1925) (malicious interference with employment); *see also Johnson v. Radde*, 293 Minn. 409, 410, 196 N.W.2d 478, 480 (1972) (malice as grounds for punitive damages); *Sorenson v. Chevrolet Motor Co.*, 171 Minn. 260, 264, 214 N.W. 754, 755 (1927) (malicious interference with contract); *Lammers v. Mason*, 123 Minn. 204, 205–06, 143 N.W. 359, 360 (1913) (malicious prosecution).[5] In the official immunity context, wilful and malicious are synonymous.

We must determine whether a genuine issue of material fact exists as to whether Gregg's actions could constitute a wilful or malicious wrong. *See Elwood*, 423 N.W.2d at 679. Gregg argues that he could not have committed a wilful or malicious wrong because no clearly established law or regulation prohibited his conduct at the time he removed Rico from the Assistant to the Commissioner position. We agree.

■ Accepting as true Rico's allegations, a jury could make inferences favorable to Rico and find that Gregg removed Rico because he expressed concerns about improprieties and management inefficiencies at the DVA. In this sense, Gregg's actions would be intentional or wilful. But the wilful or malicious wrong exception to official immunity contemplates something more. The defendant must have reason to know that the challenged conduct is prohibited. The exception does not impose liability merely because an official *intentionally* commits an act that a court or a jury subsequently determines is a wrong. Instead, the exception anticipates liability only when an official intentionally commits an act that he or she then has reason to believe is prohibited.

In section 1983 actions government officials are entitled to immunity from liability for damages unless the official's conduct

---

5. Common law malice in the defamation context has a distinct definition: whether the defendant made the statement "from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff." *Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 381 (Minn.1990) (quoting *McKenzie v. William J. Burns Int'l Detective Agency*, 149 Minn. 311, 312, 183 N.W. 516, 517 (1921)).

violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In *Elwood*, we rejected the argument that federal law supplanted the Minnesota common law doctrine of official immunity in part because *Harlow* "completely reformulated qualified immunity along principles not at all embodied in the common law, replacing the inquiry into subjective malice so frequently required at common law with an objective inquiry into the legal reasonableness of the official action." 423 N.W.2d at 677 (quoting *Anderson v. Creighton*, 483 U.S. 635, 645, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987)).

 Nevertheless, federal decisions interpreting qualified immunity under section 1983, though certainly not conclusive, are instructive when we examine an official immunity issue because section 1983 qualified immunity and common law official immunity further the same purpose. Both are designed to prevent the threat of personal liability from inhibiting public officers in the effective and independent performance of their duties. *Compare Elwood*, 423 N.W.2d at 678 (official immuni-

ty) *with Harlow*, 457 U.S. at 814, 102 S.Ct. at 2736 (qualified immunity). Today we reiterate that official immunity, as a state common law doctrine, retains an existence distinct from qualified immunity. *Elwood v. Rice County*, 423 N.W.2d 671, 677 (Minn.1988). We merely hold that the legal reasonableness of the official's actions is relevant to whether the public employee committed a wilful or malicious wrong under the doctrine of official immunity.

 In this case, we hold that as a matter of law Gregg did not commit a wilful or malicious wrong. When Gregg removed Rico from his unclassified position in July 1986, this court had not decided *Phipps v. Clark Oil & Refining*, 408 N.W.2d 569, 571 (Minn.1987) (allowing "an action for wrongful discharge if th[e] employee is discharged for refusing to participate in an activity that the employee, in good faith, believes violates" the law), and the legislature had not enacted the whistleblower statute. *See supra* note 3. Gregg had no reason to believe that, by removing Rico, an unclassified employee who could be dismissed at any time without reason, *see Finch v. Wemlinger*, 310 N.W.2d 66, 68 (Minn.1981), he was violating Rico's rights.[6]

6. Even if federal law provided Rico with a remedy for a first amendment violation by a state official, it was not clearly established that Gregg's actions would have violated the first amendment. The Supreme Court in *Connick v. Myers*, applied a case-by-case balancing test to determine whether a public employee was discharged in violation of her first amendment free speech rights. 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983) (citing *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). The Court balances "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*

"It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987). For purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what [she or] he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d

523 (1987). To determine whether discharging a public employee would violate clearly established free speech rights, the federal courts have applied the *Pickering/Connick* balancing test to the circumstances viewed in the light most favorable to the non-moving party. *See Thompson v. City of Starkville, Miss.*, 901 F.2d 456, 460 n. 2 (5th Cir.1990); *Giacalone v. Abrams*, 850 F.2d 79, 85 (2d Cir.1988); *Noyola v. Texas Dep't of Human Resources*, 846 F.2d 1021, 1025 (5th Cir.1988). Unless the plaintiff alleges a question of material fact sufficient to tip the *Pickering/Connick* balance in the plaintiff's favor so that the unlawfulness of the defendant's action would be apparent, the defendant is entitled to qualified immunity. *Thompson*, 901 F.2d at 469–70 (holding that material issue of fact existed to avoid finding of qualified immunity where police officer was terminated for reporting other officers' misconduct and improper promotions and for aiding other police officers in filing grievances); *Giacalone*, 850 F.2d at 86 (holding law not clearly established that attorney general would violate first amendment rights of Giacalone, an assistant attorney general, by discharging Giacalone for expressing legal and ethical concerns about the handling of a tax dispute); *Noyola*, 846 F.2d at 1025–26 (holding

Although we have imputed knowledge of the law to public officials, *Theide v. Town of Scandia Valley*, 217 Minn. 218, 231, 14 N.W.2d 400, 408 (1944), it is quite another matter to require public officials to predict changes and developments in the law. We believe that subjecting public employees to personal liability for acts that the law at the time does not proscribe, but which a court subsequently declares unlawful, would unduly bridle the public official's performance of discretionary duties. Of course, this court need not declare unlawful the precise issue or fact situation before an official's action might be considered wilful. *Cf. Mitchell v. Forsyth*, 472 U.S. 511, 535 n. 12, 105 S.Ct. 2806, 2820 n. 12, 86 L.Ed.2d 411 (1985). Here, however, Rico has not alleged any facts to demonstrate that Gregg knew or had reason to know that his intentional removal of Rico from the Assistant to the Commissioner position was proscribed at the time he acted.

Because the state and Gregg are entitled to governmental immunity under the discretionary function exception to the Minnesota Tort Claims Act and because Gregg is entitled to official immunity, the court of appeals properly dismissed Rico's complaint.

Affirmed.

COYNE, Justice (concurring).

I concur in the result.

law not clearly established that Department of Human Resources would violate first amendment by discharging welfare services technician for suggesting to supervisor that high caseload had prevented the welfare department from serving its clients).

Applying the *Pickering/Connick* balancing test to the circumstances in this case, with the facts viewed in the light most favorable to Rico, the unlawfulness of removing Rico from the Assistant to the Commissioner position—assuming it was unlawful—could not have been apparent to Gregg. Rico's allegations touched on matters of public concern. Rico, however, only communicated these concerns within the administration and admitted that he acted at least in part for personal gain. The second *Pickering/Connick* factor—the efficient performance of public services—tips heavily in the State's favor in this case. Given the importance of loyalty and political compatibility in Rico's high-level policy-making position, it was not clearly established under *Connick* and *Pickering* that Gregg's conduct violated the first amendment.