# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-2538

_____

| | | |
|---|---|---|
| Henry Szabla, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| City of Brooklyn Park, Minnesota, a | * | |
| Minnesota municipality; City of | * | |
| Crystal, Minnesota, a Minnesota | * | Appeal from the United States |
| municipality; Steven Baker, a | * | District Court for the District |
| canine officer of the City of Brooklyn | * | of Minnesota. |
| Park, individually, and in his official | * | |
| capacity as a Police Officer of the | * | |
| City of Brooklyn Park; Officer Justin | * | |
| Tourville; Sgt. Stephen Holm, | * | |
| individually, and in their official | * | |
| capacities as Police Officers of the City | * | |
| of Crystal, | * | |
| | * | |
| Defendants - Appellees. | * | |

_____

Submitted: March 18, 2005
Filed: December 1, 2005

_____

Before WOLLMAN, JOHN R. GIBSON, and COLLOTON, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Henry Szabla appeals from the district court's entry of summary judgment against him in his 42 U.S.C. § 1983 (2000) civil rights suit against the City of Brooklyn Park, Minnesota; a Brooklyn Park police officer, Steven Baker; the City of Crystal, Minnesota; and two Crystal police officers, Justin Tourville and Stephen Holm. Szabla, who was homeless, was sleeping in a city park in Crystal when he was attacked by a police dog. He alleged a violation of his Fourth Amendment rights against unreasonable detention and unreasonable use of force in the course of a stop. He also alleged related state law claims. Szabla contends that the district court erred in holding that Szabla did not come forward with evidence sufficient to create a genuine issue of material fact to establish a Fourth Amendment violation by either municipality or by the Crystal police officers. Szabla also argues that the district court erred in holding that Baker was entitled to qualified immunity. Finally, Szabla takes issue with the district court's entry of summary judgment against him on his state law claims. We affirm in part and reverse and remand as to the § 1983 excessive force claim against the City of Brooklyn Park.

On the night of August 16-17, 2000, Henry Szabla slept in Becker Park, in Crystal, Minnesota. He chose Becker Park because it was across the street from Labor Ready, a temporary employment agency that hires workers on a daily basis, and Szabla wanted to be at Labor Ready at 5:30 the next morning so that he would be first in line to get a job for the day. Szabla settled in to a shelter for portable toilets that was partly empty, which gave him room to lie down on the concrete within the shelter.

Meanwhile, at about 1:20 a.m. on August 17, police in Crystal received a report of a car wreck near Becker Park. Three Crystal police officers, Justin Tourville, Mark Peterson, and Stephen Holm arrived at the scene to find a car rammed into a tree and abandoned. The car's windshield was broken, and there was an imprint where a head had hit the windshield. Hair was sticking out of the lining of the car's roof. The car had been abandoned. The officers contacted the registered owner of the car, who said

that he had sold the car. The Crystal police determined that they needed to locate the driver because the car could have been stolen and the driver might be drunk or ill or injured. They requested a police dog to help them locate the driver. The City of Crystal did not have any police dogs, but it did have a cooperative arrangement with the City of Brooklyn Park, which agreed to send one of its police dogs, Rafco, and the officer who handled the dog, Steven Baker.

When Baker and Rafco arrived, Baker saw the car smashed into the tree, the broken windshield and the hair in the roof lining. He also noticed that there was a screwdriver on the ground next to the car and that the car was full of "property," which suggested to him that the car might have been used in a burglary.

Baker put on Rafco's tracking harness and took him to the wrecked car to get the scent of the driver. Then Baker gave Rafco the command to "track," which means to find and apprehend a person. The track command focuses on one person and instructs the dog to bite and hold the person until the handler arrives. In contrast, a "search" command would have told the dog to range out over an area and follow any scent that comes up. When told to "search," the dog should not bite. When tracking, the dog is kept on a tracking harness with a lead. Baker testified that because he did not know whether the driver was fleeing because he was involved in a crime or whether the driver had a head injury or needed medical attention, Baker reduced the fifteen-foot lead to less than six feet. Baker testified that the dog was so close his tail was brushing Baker's knees.

Baker and the dog ran through the park. They approached the shelter for the portable toilets. As soon as he came by the wall, Rafco turned in the shelter and bit Henry Szabla, who was lying on the floor of the shelter. Szabla turned over, and grabbed the dog's head; the dog lost his hold and bit Szabla again. Baker ordered Szabla to show his hands. When Szabla put his hands out, Baker called the dog off.

-3-

Szabla had bites on his legs. The number of actual bites was not clear from the record, but Szabla counted twenty-three tooth punctures on his legs and hip.

Crystal officer Holm arrived. He called Justin Tourville, who was in training, to handle the situation. Szabla testified that the police handcuffed him while he was still lying down and made him get up off the concrete by himself, while handcuffed. They patted him down and had him retrieve his billfold. When the police determined from talking to Szabla that he had no relationship to the car wreck, they took off the cuffs. Szabla himself estimated that he was in handcuffs for about "two minutes, if that." Szabla heard one of the officers say, "I gave the dog too much leash." Szabla was taken to the hospital by ambulance and treated for the bites.

Szabla brought this suit under 42 U.S.C. § 1983 for violation of his Fourth Amendment rights against the use of excessive force and against unreasonable seizures. He also alleged state law claims under a state dog-bite statute and for common law negligence, negligent training, false arrest, intentional infliction of emotional distress, and assault.

The defendants moved for summary judgment. The district court held that Szabla had come forward with evidence that Baker had violated Szabla's Fourth Amendment right against use of excessive force in seizing his person. Szabla v. City of Brooklyn Park, No. 03-866ADM/AJB, 2004 WL 1144064, at *3 (D. Minn. May 18, 2004). The claim was predicated on Baker's use of the track or bite-and-hold command without first giving warning that he was going to do so. However, the court held that at the time of the seizure of Szabla, in August 2000, the right to an oral warning before a police dog was given the command to track was not clearly established, and Baker therefore did not violate Szabla's clearly established right. Id. at *4. The court rejected the claim of unlawful detention against the individual Crystal officers, since the record showed Szabla had not been unreasonably detained, but rather that the officers had an objectively reasonable basis to believe that Szabla

-4-

may have been armed and dangerous.  Id. at *5.  The court held that Szabla's Monell-type[1] claims against Brooklyn Park and Crystal were without merit because Szabla could not identify a pattern, practice or policy of the municipalities that caused a constitutional violation.  Id. at *5-6.  In particular, the court stated that Szabla did not argue that Brooklyn Park caused the violation of his rights by its policy on police dogs, which did not require warning before giving a bite-and-hold command.  Id. at *5, n.5.

As to the state law claims, the court held that the state dog-bite statute was not applicable because it covered bites that occurred "in any place where the person may lawfully be," Minn. Stat. § 347.22, whereas Szabla was in a park after closing time, which was prohibited by an ordinance of the City of Crystal.  2002 WL 144064, at *6.  The court held that the common law claims against the individual officers were barred by the state doctrine of official immunity and that the claims against the municipalities were barred by the corresponding doctrine of vicarious official immunity.  Id. at *8.

We review de novo the district court's grant of summary judgment and its qualified immunity determination.  Kuha v. City of Minnetonka, 365 F.3d 590, 596 (8th Cir. 2004).

## I.

Szabla contends that the district court erred in holding that Baker was shielded by qualified immunity from Szabla's claim that Baker violated his Fourth Amendment right against the use of excessive force.  When the defense of qualified immunity is raised on a motion for summary judgment, the first question must be whether the

---

[1]Monell v. Dep't of Soc. Serv., 436 U.S. 658, 690-94 (1978), established the circumstances under which municipalities are liable under 42 U.S.C. § 1983.

facts, taken in the light most favorable to the plaintiff, show the officer's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). If so, then we consider whether the right was clearly established in the specific context of the case. Id.

In Baker's case, both questions are answered by our recent decision in Kuha v. City of Minnetonka, 365 F.3d 590 (8th Cir. 2004). In Kuha we considered whether the use of a dog to track and bite a fleeing suspect without giving the suspect prior warning violated the Fourth Amendment's prohibition against the use of excessive force. In that case, the police were tracking a fleeing suspect who had disappeared into a swamp. We concluded that "a jury could properly find it objectively unreasonable to use a police dog trained in the bite and hold method without first giving the suspect a warning and opportunity for peaceful surrender." Id. at 598. The facts of this case are comparable to those in Kuha, and so it follows that Szabla has come forward with facts to make a submissible case of excessive force against Baker.

In Kuha, we held that the officers were entitled to qualified immunity because it was not clearly established at the time of their action, September 22, 1999 or indeed until Kuha itself was decided in 2003,[2] that it was always unconstitutional to use a police dog to bite and hold a suspect without giving a prior warning. Id. at 602. We held that, before Kuha was decided, where the suspect's location was unknown, a reasonable officer could have concluded that a warning could place the officers at undue risk from a hiding suspect and that therefore no warning was required. Id. at 602-03.

In this case, as in Kuha, the officer accompanied the dog, rather than allowing the dog to run loose. Keeping the dog on the lead gave the officer more control over

---

[2]Kuha was originally filed in 2003, 328 F.3d 427 (8th Cir. 2003), but was amended on rehearing by the panel, 365 F.3d 590 (8th Cir. 2004).

the dog, but it also exposed the officer to greater risk. In both cases, the officer was running with the dog, at night, searching for a person who had fled and whose whereabouts were unknown. Szabla argues that this case is distinguishable from Kuha because Baker used a dog to track a person who may have fled because he was injured or ill, not because he wanted to evade the police. This distinction is indeed relevant to the Fourth Amendment reasonableness of Baker's use of the track command, but it does not demonstrate that any reasonable officer would have known on August 17, 2000, that a prior warning was constitutionally required in these circumstances. Baker is therefore entitled to summary judgment on the ground of qualified immunity.

## II.

Szabla also contends that the individual officers committed an unreasonable seizure by stopping him without reasonable and articulable grounds for suspicion and that they had no basis for frisking him and handcuffing him. We review de novo whether particular facts add up to reasonable and articulable grounds for suspicion justifying a Terry[3] stop and whether a particular detention is properly characterized as an investigatory stop or an arrest. United States v. Fisher, 364 F.3d 970, 972 (8th Cir 2004).

Upon first encountering Szabla, the officers had abundant grounds to suspect that he could be involved in criminal activity and that he could be armed or dangerous. The officers were investigating the scene of an accident in which the driver of the wrecked car had chosen to flee, even though the shattered windshield with a headprint and the roof lining with hair in it indicated that the person had likely been injured in the crash. Holm testified that leaving the scene of an accident was a criminal offense. Police had not been able to contact the current owner of the car to learn whether the car had been stolen. Baker had seen a screwdriver on the ground beside the car, and

---

[3]Terry v. Ohio, 392 U.S. 1 (1968).

property inside the car that made him suspect the car had been used in a burglary. The police dog had tracked from the car to the shelter where Szabla lay. When the police arrived at the shelter and found Szabla, they had reason to believe that he was hiding from them. Moreover, the lateness of the hour and the fact that the park was closed added to their grounds for believing Szabla could be involved in crime. Szabla was wearing a dark sweatshirt with a hood that came down over his face and dark gloves, both of which are typical of burglars' clothes.

Tourville handcuffed and frisked Szabla, but he released him as soon as he ascertained that Szabla had no connection with the wrecked car. Szabla himself estimated that he was in handcuffs for no more than two minutes.

An investigative stop premised on reasonable suspicion must be limited in scope and manner. Fisher, 364 F.3d at 973. During an investigative stop, officers must employ the least intrusive means of detention and investigation that are reasonably necessary to achieve the purpose of the stop. United States v. Navarrete-Barron, 192 F.3d 786, 790 (8th Cir. 1999). Officers may check for weapons and take additional steps that are reasonably necessary to protect themselves while they carry out their limited investigation. Id. Even the use of handcuffs does not necessarily exceed the bounds of a Terry stop. Fisher, 364 F.3d at 973; Navarrete-Barron, 192 F.3d at 791.

We conclude that there was ample reason to suspect both that Szabla could have been involved in criminal activity and that he might be armed. Moreover, the police released him as soon as they were able to ascertain that he was not armed and dangerous. Therefore, the decision to stop Szabla and the execution of the stop were lawful.

Szabla contends in particular that it was unreasonable to call Tourville to secure Szabla, rather than for Holm, who was there first, to do it. However, Tourville's

testimony is that he arrived thirty seconds after Holm radioed him, so the decision to call Tourville did not involve a significant delay.

Szabla also argues that the stop was actually an arrest, which required that the police have probable cause to believe Szabla had committed a crime, a higher standard than that required for a stop. An investigatory stop may turn into an arrest if the stop lasts for an unreasonably long time or the officers use unreasonable force in executing the stop. United States v. Miller, 974 F.2d 953, 956 (8th Cir. 1992). The record before us indicates that the stop was quite brief, with Szabla spending at most two minutes in handcuffs. The record shows that Baker did not arrive at the scene of the car crash until 1:30 a.m. and that the officers called for an ambulance for Szabla twelve minutes later. Thus, in only twelve minutes, Baker arrived on the scene, did his preliminary investigation, ran through the park, found Szabla, and detained him, and someone called for an ambulance. There was no unreasonable delay which transformed the investigatory stop into an arrest.

## III.

Szabla also contends that the district court erred in granting summary judgment to the municipal defendants--the City of Crystal and the City of Brooklyn Park--on his 42 U.S.C. § 1983 claim. Municipal defendants may be liable under § 1983 where an unconstitutional action "'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the city's] officers,'" or where the unconstitutional action was caused by governmental custom. Kuha v. City of Minnetonka, 365 F.3d 590, 603 (8th Cir. 2004) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978)).

Szabla's claim against the City of Crystal fails because Szabla did not come forward with evidence of a constitutional violation by Crystal's officers.

In contrast, Szabla's claim against the City of Brooklyn Park is predicated on the action of Baker in giving the police dog a track command without first warning those in harm's way, which we have already held was sufficient evidence of a constitutional violation to withstand the summary judgment motion.  Supra at 6.  A city operating under a policy or custom that deprives people of their constitutional rights can be liable even though the officer who carried out the deprivation is entitled to qualified immunity.  Kuha, 365 F.3d at 603.  Thus, Brooklyn Park can be liable even though Baker is not.

Szabla's theory is that Brooklyn Park's policy on the use of police dogs, Directive 331, allows the use of dogs without requiring a warning.  Directive 331 does not specifically discuss the use of tracking or bite-and-hold commands, but it does authorize use of dogs for five purposes.  Two of those purposes involve apprehension of persons.  Directive No. 331 ("b.  To use in arresting known dangerous criminals who will, or might offer physical resistance to the arresting officer or who might attempt to flee or escape custody." and "c.  To use in search and apprehension work for intruders, prowlers, escapees, burglars, window peepers, persons known or believed to have committed a crime of violence, persons attempting to flee or escape from police, and to use in trail work to locate missing persons.")  In his deposition, Baker used the terms "apprehend" and "bite" as synonymous: "Q: What does 'bitework' mean?  A: Apprehensions."  The jury could certainly find that the policy authorizing use of a dog to apprehend persons included authorization to use track or bite and hold commands.  The policy does not discuss the need for a warning.

In Kuha we held that a city's directive for police dog use, which authorized use of dogs to bite and hold but did not mandate a verbal warning, constituted a policy that could render the city liable for an excessive force claim.  365 F.3d at 607.  We stressed that the city was free to argue that the city actually required a verbal warning, despite the apparent omission in the formal policy.  Id.  Thus, while the city might well prevail at trial, it was not entitled to summary judgment.  Kuha compels a similar

conclusion in this case.[4] There is therefore a jury issue as to whether Brooklyn Park authorized the use of dogs to apprehend and bite persons without a prior warning.

The district court did not consider this argument, because it concluded that Szabla had not raised it. 2004 WL 1144064, at *5 n.5. However, our review of the district court pleadings shows that Szabla argued in his opposition to summary judgment that "Brooklyn Park's failure to have a policy that explains the use of a canine as use of force, fosters the use of excessive force because, as in this case, Baker has no guidance about the canine use." Szabla argued that by commanding the dog to track, Baker took the risk that the dog might bite an injured person. Also, in oral argument before the court, counsel cited the <u>Kuha</u> holding that the city could be liable based on its directive about dog use. Admittedly, neither argument clearly states that the Directive is defective for failure to require a warning, but we conclude that the argument about the adequacy of the police dog directive, together with the invocation of <u>Kuha</u>, is sufficient to have preserved this issue below.

Accordingly, we reverse the district court insofar as it granted summary judgment on the § 1983 claim to the City of Brooklyn Park.

---

[4]The dissent contends that this case extends the holding of <u>Kuha</u>. <u>Infra</u> at 15. On the contrary, Brooklyn Park's canine policy is worse than the policy at issue in <u>Kuha</u>. The policy in <u>Kuha</u> explicitly required a warning before releasing the dog, but because the requirement was ambiguous and seemed to be limited to indoor settings, we held that there was a jury issue as to whether the policy allowed release of the dog without a warning in an outdoor setting. 365 F.3d at 607. Brooklyn Park Directive No. 331 allows use of dogs to apprehend (i.e., bite) persons, but has no warning requirement at all. Our holding is therefore more modest, not more expansive, than <u>Kuha's</u>, and to hold that Brooklyn Park is entitled to summary judgment, we would have to retreat from <u>Kuha</u> or distort it.

IV.

The district court entered summary judgment against Szabla on his claim under Minnesota's dog-bite statute, Minn. Stat. § 347.22 (2002). Szabla did not argue in his brief that this holding was incorrect, but he submitted a letter under Fed. R. App. P. 28(j), citing the recent case of Hyatt v. Anoka Police Dep't, 691 N.W.2d 824, 828 (Minn. 2005), which held that the dog-bite statute applies to police dogs and the municipalities that own them.

Section 347.22 provides:

> If a dog, without provocation, attacks or injures any person who is acting peaceably in any place where the person may lawfully be, the owner of the dog is liable in damages to the person so attacked or injured to the full amount of the injury sustained.

Under Crystal Ordinance section 815, the closing time for Becker Park is 11:00 p.m., and a person may not remain in the park after that hour (except under an inapplicable exception). It was contrary to law for Szabla to be in the park at 1:20 a.m., and therefore the statute does not impose liability for the dog bite.

V.

The district court held that Szabla's state tort claims of negligence, negligent training and supervision, false arrest, intentional infliction of emotional distress, and battery were barred by the Minnesota doctrine of official immunity. "The doctrine of official immunity protects from personal liability a public official charged by law with duties that call for the exercise of judgment or discretion unless the official is guilty of a wilful or malicious wrong." Rico v. State, 472 N.W.2d 100, 106-07 (Minn. 1991).

Szabla admits in his brief that "all of the wrongful and illegal acts performed [by] the officers were discretionary." Because he has admitted the first element of the official immunity defense, the only question is whether the officers acted with malice. "Malice means nothing more than the intentional doing of wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right." Rico, 472 N.W.2d at 107 (internal quotation marks omitted). The malice required for the Minnesota official immunity differs from the analogous component of federal qualified immunity in that the Minnesota defense preserves the subjective aspect of malice, whereas the federal defense is a purely "objective inquiry into the legal reasonableness of the official action." Id. at 108. However, the legal reasonableness of the officer's actions is still relevant to the question of malice under Minnesota law. Id.

Szabla's arguments that the officers acted with malice all depend on our having arrived at different results on the questions we considered earlier, such as whether Baker had reason to know he was using excessive force and whether the Crystal officers stopped Szabla unlawfully. Contrary to Szabla's argument, we have already held that any constitutional violation by Baker was not of a clearly established right and that the Crystal officers did not violate Szabla's rights. Supra at 7-10. It therefore follows that Szabla's malice argument fails. The officers are entitled to Minnesota official immunity.

Similarly, Szabla argues that the cities of Crystal and Brooklyn Park should not be protected by vicarious official immunity, see Kuha, 365 F.3d at 608-09 (extending vicarious official immunity to the City of Minnetonka), because the individual officers should not be protected. Since we have decided Baker, Tourville, and Holm are entitled to official immunity, we have already rejected the premise of Szabla's argument and need pursue the argument no further.

VI.

We affirm the district court's entry of summary judgment against Szabla, except that we reverse as to the 42 U.S.C. § 1983 claim against the City of Brooklyn Park. This case is remanded for further proceedings consistent with this opinion.

COLLOTON, Circuit Judge, concurring in part and dissenting in part.

I would affirm the judgment of the district court, including its grant of summary judgment to the City of Brooklyn Park, because I believe the contrary conclusion works an unwarranted expansion of municipal liability beyond the holding of *Kuha v. City of Minnetonka*, 365 F.3d 590 (8th Cir. 2003). In *Kuha*, we held that the plaintiff could pursue a claim against the city based on an alleged unconstitutional "policy" of using police dogs to bite and hold without warning, where the police department's dogs were trained to bite and hold *all* suspects, the city's policy specified that warnings were required in some circumstances but made no mention of warnings in others, and the chief of police testified that the use of dogs to bite and hold a suspect without warning was in accordance with departmental policy. *Id*. at 606-07.

We have emphasized in *Kuha* and elsewhere, however, that a "policy" that may give rise to municipal liability under 42 U.S.C. § 1983 for "caus[ing]" a deprivation of rights must be "an official policy, *a deliberate choice of a guiding principle or procedure* made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999) (emphasis added). This is because "[m]unicipal liability under § 1983 attaches where – and only where – *a deliberate choice to follow a course of action is made from among various alternatives* by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986) (plurality opinion) (emphasis added); *see also Oklahoma City v.*

-14-

*Tuttle*, 471 U.S. 808, 823 (1985) (plurality opinion); *Jane Doe A v. Special Sch. Dist.*, 901 F.2d 642, 645 (8th Cir. 1990). In this circuit, the first task in considering potential municipal liability for an allegedly unconstitutional policy is to determine what is the governmental body's policy. *Dick v. Watonwan County*, 738 F.2d 939, 943 (8th Cir. 1984). "The second task is to determine whether that policy is unconstitutional." *Id.* A policy that leaves discretion to individual officials, who might later act unconstitutionally, but does not "affirmatively sanction" the unconstitutional acts, does not itself give rise to liability under § 1983. *Id.*; *see also Patzner v. Burkett*, 779 F.2d 1363, 1367 (8th Cir. 1985) ("[T]he plaintiff must show not only that a policy or custom existed, and that it was causally related to the plaintiff's injury, but that the policy itself was unconstitutional.").

Unlike *Kuha*, the evidence here does not support a finding that the City of Brooklyn Park made a deliberate choice to use police dogs by giving bite-and-hold commands without advance warning. The City's policy does provide for the use of dogs in searching for, apprehending, or arresting certain persons, but it is not unconstitutional to use dogs for those purposes. The constitutional problem arises from *the manner* in which the dogs are used, and Szabla must show that the City's policy "affirmatively sanctioned" using the dogs in an unconstitutional manner.

The policy, however, does not give official sanction to using dogs to bite suspects without advance warning. An officer may use a dog in arresting a suspect without any biting at all, simply by announcing the dog's presence in order to persuade the suspect to comply. (App. 306). As contrasted with *Kuha*, the dogs in this case were not trained to bite and hold *all* suspects. Szabla himself points out: "When a dog is given a command to search, he should not bite anybody; however, when he is given a command to track, the dog knows that it is acceptable to bite. (A. 314)." (Br. of Appellant, at 10). If a police officer does elect to give a "track" command, then the written policy does not evidence a deliberate choice to refrain from warning suspects about the use of dogs, and there is no testimony from a policymaker,

-15-

as in *Kuha*, ratifying the unconstitutional conduct. The statements of an individual police officer equating "apprehension" of suspects with unconstitutional "bitework," *ante*, at 10, does not amount to a conscious decision by city policymakers to choose that course of action.

Indeed, Szabla's principal contention has been that the City's *failure to have a policy* giving guidance on canine use "foster[ed] the use of excessive force," and thus amounted to a constitutional violation. (Br. of Appellant at 26). Some may view the absence of a considered policy on how to use police dogs and whether to give warnings as "worse" than adoption of a policy that consciously elects to use unconstitutional dog bites in only limited cases, *cf. ante*, at 11, n. 4, but the failure of the City to create more detailed rules for the use of dogs does not make the existing policy unconstitutional. *See Dick*, 738 F.2d at 942 ("The Board might have chosen to adopt more detailed guidelines, and such rules might have averted the mistake that was made in this case, but the Board's decision to rely on its employees' judgment is certainly not unconstitutional in and of itself."). It is the deliberate choice by policymakers to affirmatively sanction an unconstitutional practice that creates the potential for municipal liability based on an unconstitutional "policy." *Id.* at 943. Deliberate *indifference* to constitutional violations arising from the absence of a clear policy (often characterized as the "failure to train" police officers) may violate the Constitution in limited circumstances, *City of Canton v. Harris*, 489 U.S. 378, 387-88 (1989), but liability on that basis is analytically distinct from liability for maintaining an unconstitutional policy.

In this case, the district court, noting that Szabla's apprehension was an isolated incident, properly concluded that there is insufficient evidence to support a claim of inadequate training against the City, and the court does not suggest otherwise. There is likewise insufficient evidence to show an official policy to use police dogs to bite and hold suspects without warning. Therefore, I would affirm the judgment of the district court.

_____